ATTORNEYS FOR APPELLANT
William Van Der Pol, Jr.
Martinsville, Indiana

Teresa D. Harper
Bloomington, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Andrew A. Kobe
Deputy Attorney General
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court

_____

No. 15S00-0109-DP-393

TOMMY R. PRUITT,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

_____

Appeal from the Dearborn Circuit Court, No. 15C01-0109-CF-00054
The Honorable James D. Humphrey, Judge

_____

On Direct Appeal

_____

**September 13, 2005**

**Boehm, Justice.**

Tommy Pruitt was charged with the murder of Deputy Daniel Starnes of the Morgan County Sheriff's Department. The prosecutor sought the death penalty based on the fact that the victim was a law enforcement officer killed in the course of his duties. Pruitt sought to have the death penalty charge dismissed on the ground that he is mentally retarded and therefore ineligible for the death penalty. The trial court denied the motion, and a jury subsequently convicted Pruitt and recommended death. The trial court imposed that sentence. We conclude that the trial

court's finding that Pruitt is not mentally retarded is supported by the evidence. We also hold that, with one exception, the Indiana statutory provisions governing determination of mental retardation are consistent with the Eighth Amendment as explained in Atkins v. Virginia, 536 U.S. 304 (2002). We affirm Pruitt's conviction and sentence.

## Factual and Procedural Background

On June 14, 2001, Morgan County Deputy Sheriff Daniel Starnes was driving his unmarked patrol car on a routine assignment serving warrants. His son, Ryan Starnes, accompanied him as part of a college internship. A car driven by Pruitt caught Starnes's attention and Starnes followed Pruitt for some distance, observing increasingly erratic driving. Eventually Pruitt came to a stop and Starnes pulled in behind Pruitt's car, turned on his flashing lights, and approached Pruitt's vehicle on foot. Starnes obtained Pruitt's driver's license and registration and returned to his vehicle to call the information in. In response, Starnes was told that a recent robbery report suggested Pruitt might be in possession of stolen weapons. As Starnes approached Pruitt's car for a second time, Pruitt emerged with a handgun and the two exchanged gunfire. Pruitt was shot at least seven times and Starnes was struck by five shots. Pruitt also fired at Ryan Starnes, who had remained in Starnes's car.

Starnes was taken by helicopter to Methodist Hospital in Indianapolis where he underwent surgery. Starnes's condition initially stabilized to the point that he no longer required intensive care, but shortly thereafter he developed an infection. He ultimately died on July 10, 2001.

While Starnes was still living, the state charged Pruitt with two counts of attempted murder, possession of a firearm by a serious violent felon, two counts of possession of a handgun without a license, resisting law enforcement, and three counts of receiving stolen property. On August 27, 2001, the state amended the attempted murder count to charge Pruitt with murder and added another count of receiving stolen property. The state requested the death penalty based on the fact that Starnes was a law enforcement officer. A jury found Pruitt guilty of murder, attempted murder, possession of a handgun without a license, resisting law enforcement, four counts of receiving stolen property, and also the lesser-included offense of aggravated battery. At the penalty phase, the jury found that Pruitt killed a law enforcement officer in the course of

2

his duties, determined that the aggravating circumstances outweighed the mitigating circumstances, and recommended a sentence of death. The jury reconvened for a third phase of the trial and found Pruitt guilty of possession of a firearm by a serious violent felon and possession of a handgun without a license as a Class C felony, both of which had been reserved for a bifurcated trial. The jury also found Pruitt to be a habitual offender. The trial court sentenced Pruitt to death for the murder and to an aggregate term of 115 years for the remaining counts. Pursuant to Indiana Appellate Rule 4(A)(1)(a), appeal is directly to this Court.

## I. Mental Retardation

Pruitt contends that he is mentally retarded and therefore ineligible for the death penalty under both Indiana state law and the Eighth Amendment as explained in Atkins v. Virginia, 536 U.S. 304 (2002).

### A. *Burden of Proof and Standard of Proof*

Since 1994, Indiana has prohibited the execution of the mentally retarded. Ind. Code § 35-36-9-6 (2004) (as added by P.L. 158-1994, Sec. 3). Indiana Code sections 35-36-9-1 through 7 provide the procedures through which a trial court is to determine whether a defendant is mentally retarded and therefore not eligible for the death penalty. Indiana Code section 35-36-9-4 places the burden on the defendant to "prove by clear and convincing evidence that the defendant is a mentally retarded individual."

In Atkins, the United States Supreme Court held that the execution of a mentally retarded defendant violates the prohibition against "cruel and unusual punishments" found in the Eighth Amendment to the United States Constitution and applicable to the states through the Fourteenth Amendment's Due Process Clause. Pruitt argues that, in light of the holding that executing a mentally retarded defendant violates the Eighth Amendment, federal due process is violated by the Indiana statutory provision placing on the defendant the burden of proving mental retardation and requiring it to be established under a standard of clear and convincing evidence.

The issue of federal constitutional limits on state burdens of proof and state standards of proof was first addressed in the context of issues other than mental retardation. Patterson v. New York, 432 U.S. 197 (1977) held that it is normally within the power of a state to regulate trial

procedure, including burdens of production and persuasion.  Id. at 201-02.  Patterson upheld the constitutionality of a New York statute requiring a defendant in a murder trial to carry the burden of proving the affirmative defense of "extreme emotional disturbance" under New York law, a rough equivalent of Indiana's "sudden heat."  Id. at 198.  The Supreme Court held that the Due Process Clause does not proscribe a state rule of criminal procedure unless the procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  Id. at 202 (quoting Speiser v. Randall, 357 U.S. 513, 523 (1958); Leland v. Oregon, 343 U.S. 790, 798 (1952); Snyder v. Massachusetts, 291 U.S. 97, 105 (1934)).  Placing the burden on the defendant to prove this defense did not offend any such principle.

In Medina v. California, 505 U.S. 437 (1992), the Supreme Court relied on Patterson in sustaining a state burden of proof rule as to incompetency to stand trial.  The Court reaffirmed that "the criminal trial of an incompetent defendant violates due process" Id. at 453, but held that requiring a defendant to prove his incompetence to stand trial by a preponderance of the evidence did not offend due process.  Medina first examined historical and contemporary practices in determining a defendant's competency to stand trial and found "no historical basis for concluding that the allocation of the burden of proving incompetence to the defendant violates due process."  Id. at 448.  The Court then went on "to consider whether the rule transgresses any recognized principle of 'fundamental fairness' in operation" and found that it did not.  Id.  Because placing the burden of showing incompetency neither offended fundamental fairness nor violated traditional practice, it was consistent with the requirements of due process.

The burden of proof is one issue and the standard of required proof is another.  In Cooper v. Oklahoma, 517 U.S. 348 (1996), the Supreme Court held unconstitutional the Oklahoma requirement that a defendant prove his incompetence to stand trial by clear and convincing evidence.  Id. at 350.  Following an analysis similar to that in Medina, Cooper first explained that the right not to be tried while incompetent is fundamental.  But, as Medina held, placing the burden on the defendant to overcome a presumption of competence does not violate any fundamental principle because it affects only the few cases where the evidence as to competence is "in equipoise."  Id. at 355.  The Court then considered the standard of proof required to establish a defendant's incompetency.  After reviewing historical practice and finding that proof by a preponderance of the evidence is the standard in the great majority of United States

jurisdictions, the Court concluded that "the heightened standard [of clear and convincing evidence] offends a principle of justice that is deeply 'rooted in the traditions and conscience of our people.'" Id. at 362.

The Court then "turn[ed] next to a consideration of whether the rule exhibits 'fundamental fairness in operation.'" Id. In determining whether a heightened standard of proof was consistent with fundamental fairness, the Court balanced the opposing interests of the state and the defendant. The Court explained that if an erroneous determination of competence is made, the defendant will be forced into a trial at which he cannot communicate effectively with counsel. He therefore may be unable to exercise rights essential to a fair trial or make decisions in the course of his defense. Id. at 364. "The importance of these rights and decisions demonstrates that an erroneous determination of competence threatens a 'fundamental component of our criminal justice system.'" Id. (quoting United States v. Cronic, 466 U.S. 648, 653 (1984)).

Cooper next balanced these interests of the defendant against those of the state. The Court found that the consequences to the state are relatively minor if a court concludes that a defendant is incompetent when he is in fact malingering. That error is subject to correction in a subsequent proceeding because the state may detain a defendant for a reasonable period of time necessary to determine whether he will attain competence, and it is unusual for even the most artful malingerer to feign incompetence successfully for a period of time while under professional care. Id. The Court concluded: "the defendant's fundamental right to be tried only while competent outweighs the state's interest in the efficient operation of its criminal justice system." Id. at 367. The net result of Medina and Cooper is that it is constitutionally permissible to place the burden of proof of incompetency on the defendant, but the Eighth Amendment prohibits requiring incompetence to be shown by a heightened standard than preponderance of the evidence.

This Court first addressed the constitutionality of the Indiana statutory provision requiring a defendant to prove his mental retardation by clear and convincing evidence in Rogers v. State, 698 N.E.2d 1172 (Ind. 1998). At that time Cooper had been decided but execution of the mentally retarded had not yet been held to violate the Federal Constitution. To the contrary,

Penry v. Lynaugh, 492 U.S. 302 (1989), had expressly held that execution of a mentally retarded person did not offend due process or the Eighth Amendment.  Id. at 338-39.   Relying on Penry, Rogers held that the clear and convincing standard "does not offend a 'fundamental principle' of the sort implicated in Cooper."  698 N.E.2d at 1175.  Rogers concluded that "[g]iven that the clear and convincing standard of proof . . . does not affect the fundamental procedural fairness of a defendant's trial, and that the United States and Indiana Constitutions do not prohibit the execution of a mentally retarded defendant, we cannot conclude that the defendant's due process rights were violated."  Id. at 1176.

Pruitt argues that Atkins has since overruled Penry and has now announced a fundamental principle of law that it is unconstitutional to execute a mentally retarded defendant. Pruitt contends Atkins therefore undercuts our reasoning in Rogers.  There is no doubt that the premise cited in Rogers that the Federal Constitution permits execution of a mentally retarded person is no longer correct.  The state nevertheless contends that the ultimate conclusion of Rogers—that the fundamental fairness of a trial was not affected by the heightened standard— remains intact.

We agree that the reasoning we followed in Rogers must be revisited in light of Atkins. The state reasons that because the prohibition on the execution of the mentally retarded is a relatively recent development, it cannot be characterized as fundamental, and therefore the procedure in determining mental retardation cannot offend a fundamental principle.  Whatever merit the state's argument has in logic or history, the Supreme Court has the last word on this issue of federal law, and we consider it resolved by Atkins.  In the course of recognizing the right in the Eighth Amendment of mentally retarded defendants not to be executed, the Supreme Court has identified that right as grounded in a fundamental principle of justice.  Atkins, 536 U.S. at 306.  The reasoning of Cooper in finding a clear and convincing standard unconstitutional as to incompetency is directly applicable to the issue of mental retardation.  Cooper considered the historical and contemporary practice of the standard of proof and whether Oklahoma's clear and convincing evidence standard provides fundamental fairness in operation.  Cooper reaffirmed that "[h]istorical practice is probative of whether a procedural rule can be characterized as fundamental." 517 U.S. at 356 (quoting Medina, 505 U.S. at 446).  Cooper also looked to contemporary practice:  "The near-uniform application of a standard that is more protective of

6

the defendant's rights than Oklahoma's clear and convincing evidence rule supports our conclusion that the heightened standard offends a principle of justice that is deeply 'rooted in the traditions and conscience of our people.'" Id. at 362 (quoting Medina, 505 U.S. at 445). The state argues that there is no uniform level of proof among the states for establishing mental retardation. As in Cooper, however, only a relatively small number of jurisdictions follow Indiana in requiring clear and convincing evidence or an even higher standard.[1]

In addition to considering the historical and contemporary standards of proof applicable to establishing incompetence, Cooper also examined the fundamental fairness of requiring proof by clear and convincing evidence. Cooper first pointed out that the "more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision." Cooper, 517 U.S. at 362 (quoting Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 283 (1990)). Cooper reasoned that a defendant might be denied his right to a fair trial if the court makes an erroneous determination of competence. Id. Mental retardation is not as severe as incompetence, and does not per se render the defendant unable to participate meaningfully in the defense. See Atkins, 536 U.S. at 306. Accordingly, we adhere to the view expressed in Rogers that an erroneous determination as to a defendant's mental retardation would not deny the defendant a fair trial. However, the prospect of an execution in violation of the Eighth Amendment is obviously a very serious matter. The state argues that even if a defendant is erroneously determined not to be mentally retarded, that defendant can still argue his mental retardation to the jury as a mitigating circumstance. That may be, but as Atkins explained,

> The risk "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," is enhanced, not only by the possibility of false confessions, but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or

---

[1] Georgia requires the defendant to prove his mental retardation beyond a reasonable doubt. Ga. Code § 17-7-131 (1998). In addition to Indiana, Arizona, Colorado, and Florida require the defendant to prove he is mentally retarded by clear and convincing evidence. Ariz. Rev. Stat. Ann. § 13-703.02 (2003); Colo. Rev. Stat. Ann. § 18-1.3-1102 (West 2002); Fla. Stat. Ann. § 921.137 (West Supp. 2004). Arkansas, Maryland, Missouri, Nebraska, New Mexico, and Tennessee require proof by the preponderance of the evidence. Ark. Code Ann. § 5-4-618 (Michie 1997); Md. Code Ann., Crim. Law § 2-202 (2002); Mo. Ann. Stat. § 565.030 (Supp. 2004); Neb. Rev. Stat. § 28-105.01 (Supp. 2004); N.M. Stat. Ann. § 31-20A-2.1 (Mitchie 2000); Tenn. Code Ann. § 39-13-203 (2003). The federal government, Connecticut, Kansas, and Kentucky do not set a standard of proof. 18 U.S.C.S. § 3596 (West 2002 & Supp. 2005); Conn. Gen. Stat. Ann. § 53a-46a (West 2001); Kan. Stat. Ann. § 21-4623 (1995); Ky. Rev. Stat. Ann. § 532.135 (Mitchie 1999).

more aggravating factors. Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes. . . . Mentally retarded defendants in the aggregate face a special risk of wrongful execution.

Atkins, 536 U.S. at 320-21.

Finally, as in Cooper, the interests of the state and defendant must be balanced. The state argues that the injury to the state of a malingering defendant being erroneously found to be mentally retarded is substantial because the state is prevented from holding the defendant responsible for his crimes to the fullness of the law. We think Atkins informs resolution of this issue as well. As Atkins pointed out, mentally retarded persons may not be executed, but they remain subject to punishment for their crimes. 536 U.S. at 306. Cooper held a clear and convincing standard unconstitutional as to incompetency because it would result in some persons who are incompetent nonetheless going to trial. Similarly, requiring a defendant to establish mental retardation by clear and convincing evidence would result in execution of some persons who are mentally retarded. In the language of the Supreme Court: a heightened standard of proof "does not decrease the risk of error, but simply reallocates that risk between the parties." Cooper, 517 U.S. at 366. We do not deny that the state has an important interest in seeking justice, but we think the implication of Atkins and Cooper is that the defendant's right not to be executed if mentally retarded outweighs the state's interest as a matter of federal constitutional law. We therefore hold that the state may not require proof of mental retardation by clear and convincing evidence.

B. *Pruitt's Claim of Mental Retardation*

All of the foregoing is of interest to those who try future cases. In Pruitt's case, the trial court may have taken the same view of Cooper and Atkins as we hold today. The trial court specifically found that Pruitt failed to show by a preponderance of the evidence that he was mentally retarded. The trial court held: "even if the burden of proof in this proceeding were on the defense by a preponderance of the evidence the Defendant would not have met this burden. In fact, the evidence presented weighs in favor of a finding that Mr. Pruitt is not mentally retarded." (emphasis in original). Therefore, although we agree that the state may not require

8

proof by clear and convincing evidence, in order to overturn Pruitt's sentence, he must establish reversible error in the finding of the trial court applying a preponderance of the evidence standard.

### 1. The Statutory Definition of Mental Retardation

The trial court explained: "this Court finds that the appropriate procedure and definitions to be applied by the Court in determining whether or not Mr. Pruitt is mentally retarded is set forth in Indiana Code §§ 35-36-9-2, et. seq." Indiana Code section 35-36-9-2 defines a "mentally retarded individual" as:

> [A]n individual who, before becoming twenty-two (22) years of age, manifests:
>
> (1)    significantly subaverage intellectual functioning; and
>
> (2)    substantial impairment of adaptive behavior;
>
> that is documented in a court ordered evaluative report.

By this definition, the defendant must prove both. The trial court in this case found that Pruitt "does not have significantly sub-average intellectual functioning. At most, Mr. Pruitt's functioning would be considered borderline—not mentally retarded." Pruitt argues that the trial court's finding is reversible error. He also contends that the trial court used an incorrect standard in determining that Pruitt's adaptive behavior was not impaired.

### 2. Standard of Review

We sometimes phrase review of findings of fact as subject to an "abuse of discretion" standard. See, e.g., Rogers, 698 N.E.2d at 1180 (citing a number of other opinions of this Court for the proposition that we give "great deference to a trial court's findings of fact, and will disturb such findings only upon a showing of abuse of discretion"). "Significantly subaverage intellectual functioning" and "substantial impairment of adaptive behavior" are, however, factual determinations subject to a clearly erroneous standard of appellate review. As a practical matter, the result under a clearly erroneous standard—reversal or affirmance—is virtually the same as under the oft-cited abuse of discretion standard. Trial courts do not, however, have "discretion" to make findings. Rather, trial courts are to use their best judgment to arrive at the correct result.

They are bound by the law and the evidence and it is usually an error, not an "abuse" if the appellate court disagrees. Trial courts must of course exercise judgment, particularly as to credibility of witnesses, and we defer to that judgment because the trial court views the evidence first hand and we review a cold documentary record. Thus, to the extent credibility or inferences are to be drawn, we give the trial court's conclusions substantial weight. But to the extent a ruling is based on an error of law or is not supported by the evidence it is reversible, and the trial court has no discretion to reach the wrong result.

3. Intelligence

The trial court was presented with an array of evidence and opinions bearing on Pruitt's intelligence. Expert testimony was received from defense experts Dr. Bryan Hudson and Dr. Charles Golden, prosecution expert Dr. Martin Groff, and the court's expert, Dr. George Schmedlen. Pruitt took several IQ tests and academic achievement tests throughout his life with varying results. As a child, Pruitt was given two Lorge-Thorndike group administered IQ tests. In March 1973, he scored a verbal IQ of 64, and a non-verbal IQ of 65. In December of 1976, he scored a verbal IQ of 64 and a non-verbal IQ of 63. The state's expert, Dr. Martin Groff, concluded that he would give little weight to these results. The state points out that both Dr. Brian Hudson, Pruitt's witness, and Dr. Groff testified that the Lorge-Thorndike is a group-administered test and because group-administered tests tend to obscure the individual, individual tests are a better indicator of an individual's ability.

Pruitt was also given two academic achievement tests while in school. In March 1975, Pruitt took an Otis-Lennon School Ability Test and scored 81. Dr. George Schmedlen, the court's expert, testified that this score was inconsistent with the claim that Pruitt is mentally retarded. Other experts disagreed. Dr. Hudson testified that academic achievement tests differ from IQ tests in that IQ tests gauge true intellectual ability while academic achievement tests gauge how well someone has learned school materials. One of the defense experts testified that although academic achievement tests can be used as a tool to corroborate IQ, they cannot be used as a substitute and may vary as much as 15 to 25 points from a person's true IQ. Pruitt also argues that Dr. Schmedlen's testimony is inaccurate. Pruitt cites his own expert who explained that academic achievement tests compare individuals in the same grade in school, while IQ

testing compares persons of the same age. Pruitt points out that by the time he took the Otis-Lennon test, he had been held back two years in school and was therefore two years older than his classmates. Pruitt argues that when his Otis-Lennon results are compared to children of his own age, those results produce a score almost identical to the Lorge-Thorndike tests he took and are clearly within the mentally retarded range. Dr. Schmedlen also testified that the results of Pruitt's Iowa Basic Test in the fifth grade were consistent with his Otis-Lennon scores. Pruitt again argues that this test is an academic achievement test and that Schmedlen incorrectly failed to score age. Pruitt argues that if his age had been considered when scoring the Iowa Basic Test, that test would have also produced a result almost identical to the Lorge-Thorndike test. Pruitt concludes that when taken as a whole, the academic testing results in an average grade equivalent within the range expected for a mildly mentally retarded individual.

Pruitt was also administered intelligence tests after his schooling. While in prison for an earlier crime, Pruitt was administered a Revised Beta intelligence test and scored a 93. Citing expert testimony and a recognized journal, *Mental Retardation*, Pruitt argues that this test is "wildly inaccurate" because it focuses on non-language functioning and does not consider language functioning. In April of 2002, Pruitt took the Weschler Adult Intelligence Scale (WAIS) and scored a full scale IQ of 76. The trial court found "this test result would place Mr. Pruitt above the level set on this particular test for mental retardation." The WAIS has a standard error of measurement of five points, so Pruitt scored within the range of 71 to 81. Dr. Hudson testified that he believed there was a one-point error in scoring and that he believed Pruitt was under the influence of the antipsychotic medication Trilifon at the time he took the test and the medication superficially increased his ability, resulting in an over-estimation in that test by three to six points. Pruitt argues that the testimony of Dr. Golden and the medical literature both support this conclusion. The state counters that even Pruitt's expert, Dr. Hudson, stated that the score was an accurate reflection of Pruitt's IQ at the time and that the medication does not raise one's IQ, but simply provides a better testing environment. The state also points out that the trial court specifically found that there was insufficient evidence "as to what, if any, effect this medication may have had on Mr. Pruitt's testing results."

Finally, Pruitt was twice tested recently. On July 22, 2003, Dr. Schmedlen administered the WAIS to Pruitt. Pruitt scored a full-scale IQ of 52. However, Dr. Schmedlen testified that he

11

did not believe that Pruitt was working up to his potential when he took the WAIS and the test was therefore not an accurate measure of his intellectual functioning.  The trial court found that Pruitt "did <u>not</u> work to his full potential on this intelligence test, that he was, in fact, malingering."  (emphasis in original).  In February of 2003, Pruitt took a Stanford-Binet individually administered IQ test and scored a 65.  On the Stanford-Binet test, significantly subaverage intelligence is a score less than 69.  Pruitt argues that his score of 65 falls clearly within the range of mentally retarded and the Stanford-Binet test was identified by both Drs. Golden and Hudson as more sensitive and accurate in individuals with very high or very low IQ than the WAIS.  The state points out that Golden acknowledged that alternative methods of scoring the test could have resulted in a score of 69.  Other alternate scoring would have resulted in a score of 67.  The test has a standard error of measure of six points, so Pruitt scored within the range of 59-71 and Pruitt is therefore within the margin of error of the cutoff.

In sum, Pruitt argues that he has met his burden to show that he is mentally retarded.  He asserts that the two Lorge-Thorndike tests are within the mentally retarded range and that the Otis-Lennon and Iowa Basic tests, when properly considered against children of his age at the time also fall within the mentally retarded range, as did the Stanford-Binet result.  Pruitt also argues that the totality of the academic achievement tests correlate to the range expected for a mentally retarded individual.  Pruitt asserts that although the April 2002 WAIS is not within the mentally retarded range, Dr. Hudson provided testimony that there was a one point scoring error. Hudson testified that Pruitt's true WAIS score would have been between 75 and 69.

Citing the testimony of Dr. Golden, the trial court found "at best, intelligence testing provides an estimate of a person's IQ, and that it should be considered in conjunction with a person's actual performance in school and in life to determine whether the person meets the Indiana standard for mental retardation."  The trial court found that Pruitt has held a number of jobs over the years including construction, fast food, and long distance truck driver.  The trial court explained, "the Court considers IQ test results (an estimate of intelligence), his functioning, work history, school history, and all other evidence presented regarding Mr. Pruitt's intellectual functioning."  Pruitt argues that this suggests that the trial court used this other evidence as a substitute for Pruitt's test results to determine intelligence and that this analysis is flawed as a means of evaluating intelligence.

Indiana Code section 35-36-9-2 defines a "mentally retarded individual" solely by reference to behavior manifested before age twenty-two. The dissent argues that only IQ tests before that age are relevant to that determination. If that were the case, a defendant older than twenty-two who had never been tested could never be found mentally retarded based on IQ testing. We believe that this was not the intent of the legislature in passing section 35-36-9-2. Subsequent tests may be of less significance, but the overall evaluation including behavior and tests after age twenty-two may be relevant. More importantly, IQ tests are only evidence; they are not conclusive on either the subject's IQ or the ultimate question of mental retardation. Rather, the statutory test is "significantly subaverage intellectual functioning." In determining whether an individual is or is not mentally retarded, the trial court may consider IQ scores together with other evidence of mental capacity. While some of Pruitt's scores suggest significantly subaverage intellectual functioning, others do not. In addition to this data, the trial court found that Pruitt was able to fill out applications for employment and to have the capacity, if not the will at all times, to support himself. In light of the inconsistent IQ scores and the other evidence cited by the trial court, the trial court's finding that Pruitt did not meet the statutory test is consistent with this record.

### 4. The Standard for Adaptive Behavior

Indiana Code section 35-36-9-2 requires a defendant claiming to be mentally retarded to demonstrate "substantial impairment of adaptive behavior." Pruitt argues that this Indiana statutory standard for assessing adaptive behavior is unconstitutional after Atkins. He contends that Atkins requires all states to use a standard definition of mental retardation and cites the clinical definitions provided by the American Association on Mental Retardation (AAMR) and the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1997) (DSM-IV). Pruitt points out that in Atkins, the Court described the clinical definitions of mental retardation by the AAMR and the DSM-IV and explained that "the statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions." Atkins, 536 U.S. at 317 n.22. Pruitt argues therefore that these definitions provide the appropriate standard. AAMR currently defines mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." Am. Ass'n on Mental

13

Retardation, <u>Mental Retardation: Definition, Classification, and Systems of Supports</u> 8 (10th ed. 2002). The DSM-IV is slightly different, explaining, "the essential feature of mental retardation is significantly subaverage intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." <u>DSM-IV</u> at 39.

Although it found a "national consensus" against executing the mentally retarded, <u>Atkins</u> explained:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986), with regard to insanity, "we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.'"

536 U.S. at 317. The state argues that this language from <u>Atkins</u> allows states to define mental retardation for themselves. Most courts that have faced challenges that a defendant is mentally retarded and therefore not subject to execution have agreed. <u>See, e.g.</u>, <u>In re Johnson</u>, 334 F.3d 403, 404 (5th Cir. 2003); <u>Bell v. Cockrell</u>, 310 F.3d 330, 332 (5th Cir. 2002) (<u>Atkins</u> did not conclusively define mental retardation); <u>Gray v. State</u>, 887 So. 2d 158, 168 (Miss. 2004) ("Determining who is mentally retarded for purposes of this prohibition has been left to the individual States."); <u>Johnson v. State</u>, 102 S.W.3d 535, 540 (Mo. 2003) ("<u>Atkins</u> did not define the perimeters of mental retardation, but left 'to the States the task of'" enforcing the restriction); <u>Howell v. State</u>, 151 S.W.3d 450, 457 (Tenn. 2004). We agree that <u>Atkins</u> did not provide for a uniform definition of mental retardation, but note that <u>Atkins</u> cited with approval the clinical definitions of mental retardation, explaining that while state statutory prohibitions against executing the mentally retarded are not uniform, all, including Indiana's, "generally conform" to the clinical definitions. <u>Atkins</u>, 536 U.S. at 317 n.22.

Although <u>Atkins</u> did not specifically define mental retardation, it makes clear that the Eighth Amendment prohibits execution of the mentally retarded "about whom there is a national

consensus." Id. at 317. Although Atkins recognized the possibility of varying state standards of mental retardation, the grounding of the prohibition in the Federal Constitution implies that there must be at least a nationwide minimum. The Eighth Amendment must have the same content in all United States jurisdictions. Accordingly, we conclude that states are free to impose a higher standard, but the minimum definition of mental retardation sufficient to meet the national consensus found in Atkins must be uniform. Because Atkins explains that state statutes that provided the "national consensus" against the execution of the mentally retarded "generally conform" to the AAMR or DSM-IV definitions, we conclude that Atkins requires at least general conformity with those clinical definitions, but allows considerable latitude within that range. We agree with the concurrences that the Supreme Court specifically disavowed endorsement of the DSM-IV or any specific definition of mental retardation, but we think that the prohibition of the execution of the mentally retarded must have some content. There may be some flexibility in determining mental retardation, but we think that if a state's definition of mental retardation were completely at odds with definitions accepted by those with expertise in the field the definition would not satisfy the prohibition.

As explained above, the Indiana statute requires a defendant to show "significant impairment of adaptive behavior." I.C. § 35-36-9-2. In Rogers, this Court held that Indiana's adaptive functioning prong is "much more general and open-ended [than the DSM-IV adaptive behavior prong], requiring a showing of 'substantial impairment of adaptive behavior' without specifying any particular skill levels." 698 N.E.2d at 1179 n. 17. The state also points out that in Rondon v. State, 711 N.E.2d 506, 516 n.14 (Ind. 1999), this Court did "not adopt the DSM-IV's definition of adaptive functioning as the definition of adaptive behavior."

Both Rondon and Rogers predated Atkins and were on the books at the time Atkins cited the Indiana statute as among those forming the national consensus. We must construe the Indiana statute in conformity with the Eighth Amendment. However, we agree that Atkins allows states flexibility in defining mental retardation, as long as the definition is within the national consensus. Soon after Atkins was decided, the AAMR definition of mental retardation was amended and no longer requires significant limitations in adaptive functioning in specific skill areas. Its current definition calls for "significant limitations in . . . adaptive behavior as expressed in conceptual, social, and practical adaptive skills." Although the Indiana statutory

15

definition is somewhat different from the DSM-IV, it is very similar to the revised AAMR definition, and therefore within the range of permissible standards under the Eighth Amendment. We conclude that the Indiana statute does not impose a standard incompatible with the Eighth Amendment as explained in Atkins. Rather, it is within the flexibility allowed by the consensus found in Atkins.

5. The Finding as to Adaptive Behavior

Indiana Code section 35-36-9-2 requires a defendant claiming to be mentally retarded to demonstrate "substantial impairment of adaptive behavior." The trial court found, "applying the Indiana standard for determination of substantial impairment of adaptive behavior, that the defense has failed to prove by clear and convincing evidence that Mr. Pruitt has substantial impairment of adaptive behavior. The Court is particularly impressed with Mr. Pruitt's ability to function as a carpenter, obtain a commercial driver's license, perform duties of an over the road truck driver and fill out applications for employment." The expert witnesses were divided as to Pruitt's adaptive behavior. For the reasons given below, we conclude that the trial court's finding was predicated on a standard of impairment of adaptive behavior that was too restrictive, and therefore agree that it does not support the ultimate finding that Pruitt is not mentally retarded.

Pruitt argues alternatively that the trial court either interpreted the Indiana statute to require a higher showing than the statute requires, or, if the statute requires the showing the trial court demanded, it is unconstitutional under Atkins. Specifically, Pruitt contends that the statutory standard as understood by the trial court excludes a large percentage of individuals who would meet the AAMR and DSM-IV definitions of mental retardation. Pruitt argues that the trial court's standard, reflecting the explanation given by Dr. Schmedlen, used an inappropriate measure of substantial deficits in adaptive behavior. Schmedlen testified he used the Adaptive Behavior Scale-Residential and Community test published by the AAMR to evaluate Pruitt's adaptive behavior. This test identifies ten areas of activity (self-care, communication, self-direction, etc.). Schmedlen interviewed two people who were familiar with Pruitt and asked them about his skills in each of these areas. Only if both reporting individuals described Pruitt in terms that placed him in the 25th percentile or lower of Schmedlen's comparator group did

16

Schmedlen conclude that a substantial deficit existed in a particular area. Pruitt asserts that Schmedlen compared Pruitt to an institutionalized population made up entirely of mentally retarded individuals, not to the general population. Sixty-two percent of this comparator population of institutionalized persons had IQs below 50, and eighteen percent had IQs below 20. Pruitt points out that Dr. Schmedlen opined that the standard he was using to determine adaptive functioning would identify only individuals with IQs of 60 or less as mentally retarded. Exclusion of persons with IQs between 60 and 70 would eliminate approximately 75 to 89 percent of all individuals clinically diagnosed as mentally retarded under the standard medical definitions.

The trial court explained that it was applying "the Indiana standard for determination of substantial impairment of adaptive behavior." It appears that Pruitt is correct in contending that Schmedlen's approach was accepted by the trial court, and that it was too stringent a test.[2] As this Court explained in Rondon v. State, 711 N.E.2d 506, 517 n.14 (Ind. 1999), the statute does not define adaptive behavior. Many courts have therefore looked to clinical definitions to determine adaptive behavior.[3] Rondon made clear that Indiana does not adhere strictly to the clinical definitions: "we do not adopt the DSM-IV's definition of adaptive functioning as the definition of adaptive behavior." 711 N.E.2d at 516 n.14. As Rondon noted, however, "the DSM-IV may provide some guidance as to the type of information useful to the determination of substantial impairment of adaptive behavior under the statute." Id. Similarly, in Rogers, this Court reviewed the DSM-IV but explained "Indiana Code § 35-36-9-2 is much more general and open-ended, requiring a showing of 'substantial impairment of adaptive behavior' without specifying any particular skill levels." 698 N.E.2d at 1179 n.17.

Atkins is not inconsistent with this general proposition but, as we observed in discussing the standard for adaptive behavior, the Eighth Amendment must have the same content in every

[2] In its findings, the trial court explained that Schmedlen found Pruitt to exhibit substantially impaired adaptive behavior under the AAMR standard, but cited Rogers and concluded: "However, Dr. Schmedlen also analyzed Mr. Pruitt under the more general standard of Indiana law, noting that Indiana law is not bound by the AAMR standards. In conducting this more general review, Dr. Schmedlen found that Mr. Pruitt did not qualify as being substantially impaired in adaptive behavior."

[3] See, e.g., State v. Grell, 66 P.3d 1234, 1239 (Ariz. 2003); Money v. Krall, 180 Cal. Rptr. 376, 388 (Cal. Ct. App. 1982); State v. Harris, 859 A.2d 364, 445-46 (N.J. 2004); Howard v. State, 153 S.W.3d 382, 386 (Tex. Crim. App. 2004).

17

state.  <u>Atkins</u> found the Indiana statute to "generally conform" to the described clinical definitions.  536 U.S. at 317 n.22.  We think the national consensus minimum is the only identifiable benchmark, and thus some variation is permissible but the interpretation Dr. Schmedlen gave to the trial court does not meet that requirement.  In sum, we find the Indiana statute to meet <u>Atkins</u> requirements, but we do not interpret it to vary from the clinical standards to the extent that it embraces only those in the bottom ten to twenty-five percent of those meeting the clinical standards.  We, like the U.S. Supreme Court in <u>Atkins</u>, leave refinement of that standard for another day.  For purposes of this case it is sufficient to note that the clinical definitions provide a safe harbor.  Although variation is permissible, it cannot go to the point of excluding a majority of those who fit clinical definitions.

### 6. The Finding as to Mental Retardation

Because the adaptive behavior standard applied by the trial court was too restrictive, the trial court's finding on that prong is not supportable.  However, a finding of mental retardation requires a showing of both significantly subaverage intelligence and significant limitations in adaptive functioning.  We agree that the evidence on the adaptive behavior prong is at least conflicting.  Nevertheless, the trial court ultimately found that Pruitt failed to prove by a preponderance of the evidence that he is mentally retarded.  Indeed, the trial court found that the evidence established that Pruitt was not mentally retarded.  As to the intelligence prong, the finding is supported by the record.  The ultimate finding is therefore not clearly erroneous and we affirm.

### C. *Statutory Procedure for Determining Mental Retardation*

Although we find the clear and convincing evidence standard required by Indiana Code § 35-36-9-4 to violate the Federal Constitution, no party argues that other provisions of Indiana law necessarily fall with the standard of proof.  We agree that this provision is severable and the remainder of the statute is not invalid simply by reason of unconstitutionality of the clear and convincing evidence standard.  Accordingly, we address Pruitt's challenges to the other provisions of the Indiana statute governing determination of mental retardation.

18

If a defendant petitions the trial court to dismiss the death penalty arguing that he or she is mentally retarded, the statute calls for the trial court to determine whether the defendant is mentally retarded no later than ten days before the trial is to begin. I.C. § 35-36-9-5. The trial court is to order an evaluation of the defendant for the purpose of obtaining evidence on the defendant's intellectual functioning and adaptive behavior and to hold a hearing to determine the defendant's mental retardation. I.C. § 35-36-9-3-4. Pruitt argues that this procedure for determining whether a defendant is mentally retarded is unconstitutional because it "conflicts with several other constitutional protections afforded a defendant." Pruitt contends that because the judge decides whether the defendant is mentally retarded and therefore not eligible for the death penalty, any juror who is aware that the execution of the mentally retarded is unconstitutional "is left with the uneasy decision of how they can be compelled to determine if a defendant is to live or die, but is never given the option to find the defendant mentally retarded." Because the defendant is charged with the death penalty, Pruitt asserts the juror will infer that the judge has already determined the defendant is not mentally retarded, and any juror who knows or suspects that the judge has already determined that the defendant is not mentally retarded will give short shrift to any contrary evidence. Pruitt argues that this procedure thus violates the Eighth Amendment by weighting the decision against a finding of mental retardation.

Pruitt argues alternatively that a juror who knows that the execution of the mentally retarded is unconstitutional but is not asked to decide whether a defendant is mentally retarded will conclude that a judge will oversee their decision, determine that a defendant is mentally retarded and vacate the death sentence. Pruitt argues that this violates Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) ("On reaching the merits, we conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.").

In sum, Pruitt raises two challenges. First, he argues that a juror who knows or suspects that the judge has already found the defendant not mentally retarded may not fully consider the evidence relevant to mental retardation. Second, Pruitt argues that if the jury believes that the judge has the final word on mental retardation, the jury may not take seriously its role in recommending the death penalty. The state argues that Pruitt failed to raise these issues at trial

19

and that they are therefore forfeited. The state also contends that there is no evidence that any juror was aware of <u>Atkins</u>. Pruitt concedes that the state agreed to dismiss any juror who had knowledge that the judge had determined that Pruitt was not mentally retarded. When asked about pre-trial publicity, one juror admitted that he had heard that Pruitt had been found "mentally competent to stand trial" and that juror was dismissed. We agree that these arguments were not raised at trial and are therefore not available on appeal. We also agree that there is no evidence that any juror was aware of <u>Atkins,</u> and therefore no basis to draw the inferences Pruitt suggests. <u>See</u> <u>Bruno v. State</u>, 774 N.E.2d 880, 883 (Ind. 2002). More significantly, even if we assume a juror's familiarity with the law, these contentions are based on speculation as to inferences the juror may draw, and presuppose the juror will not follow instructions. We find no substance to these claims on this record.

## II. Other Constitutional Challenges to Indiana's Death Penalty Statute

### A. <u>Blakely v. Washington</u>

Pruitt next argues that in light of <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), Indiana Code section 35-50-2-9 is unconstitutional because <u>Blakely</u> requires that a jury not only must find beyond a reasonable doubt the existence of an aggravating factor, but must also determine beyond a reasonable doubt that the aggravating factors outweigh any mitigating factors before a sentence of death can be imposed. <u>Ritchie v. State</u>, 809 N.E.2d 258, 268 (Ind. 2004), addressed this issue. Indiana law authorizes the death penalty if one or more of the "aggravating circumstances" listed in I.C. § 35-50-2-9(b) is found by a jury beyond a reasonable doubt. The Sixth Amendment right to jury trial requires that eligibility factors be admitted by the defendant or found beyond a reasonable doubt by a jury. <u>See</u> <u>Ring v. Arizona</u>, 536 U.S. 584, 602 (2002); <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000). Under the Indiana statute, if eligibility factors exist, then the defendant is "death eligible," that is, a jury may recommend the death penalty. I.C. § 35-50-2-9(e), (l)(1). We held in <u>Ritchie</u> that "Once a statutory aggravator is found by a jury beyond a reasonable doubt, the Sixth Amendment as interpreted in <u>Ring</u> and <u>Apprendi</u> is satisfied." 809 N.E.2d at 268. We adhere to that view.

Death may be imposed if the jury recommends it after weighing the aggravating and mitigating circumstances. <u>See</u> I.C. § 35-50-2-9(1)(2). As <u>Ritchie</u> observed, the statute does not

provide guidance as to what standard governs the weighing process. We held in <u>Ritchie</u> that because the weighing process does not increase eligibility, a jury is not required to find beyond a reasonable doubt that the eligibility factors outweigh the mitigating factors. 809 N.E.2d at 265. Rather we concluded that the weighing process is not a fact finding exercise, but is "an exercise in judgment that is not capable of evaluation beyond a reasonable doubt." <u>Id.</u> at 268.

The Supreme Court's holding in <u>Blakely</u> does not alter our holding in <u>Ritchie</u>. In <u>Blakely</u>, the Court held "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 542 U.S. at ___, 124 S. Ct. at 2536 (quoting <u>Apprendi</u>, 530 U.S. at 490). A jury's determination of whether the eligibility factors outweigh any mitigating factors is not a finding of fact and it does not increase the penalty of the crime. <u>Ritchie</u>, 809 N.E.2d at 266. The weighing process fixes the punishment within the eligible range established by the aggravating circumstances found by the jury. We affirm our holding in <u>Ritchie</u> that the Indiana death penalty statute is constitutional.

## B. <u>Apprendi</u>/<u>Ring</u>

Indiana law directs that when a defendant files a petition alleging that the defendant is a mentally retarded individual, the judge is to rule on the petition at a hearing to be held not later than ten days before the initial trial date. Ind. Code § 35-36-9-5 (2004). Pruitt argues that the determination whether an individual is mentally retarded is a sentence enhancing factual determination. If this were accurate, then Indiana's scheme, which directs the court to make this judgment, would violate the Sixth Amendment to the United States Constitution. <u>See</u> <u>Blakely</u>, 542 U.S. at __, 124 S. Ct. at 2537; <u>Ring</u>, 536 U.S. at 602; <u>Apprendi</u>, 530 U.S. at 482-83.

We find no case on point as to this claim but reject it as premised on a misunderstanding of how the Indiana statute works. The absence of mental retardation is not an eligibility factor for capital punishment. Until the defendant raises and proves the issue of mental retardation, it is assumed that the defendant is not mentally retarded. Hence, a pretrial determination by the court of whether a defendant is mentally retarded reduces the potential maximum punishment but does not enhance it. Therefore, the Sixth Amendment is not in play with regard to the pretrial determination of mental retardation in death sentence cases.

21

C. *Ex Post Facto*

On November 21, 2003, Pruitt was sentenced to death as consequence to a murder that took place in 2001. In 2002, the General Assembly amended Indiana's Death Penalty Statute and the statute, as amended in 2002, was followed when assessing the death penalty to Pruitt. At the time the offense was committed, Indiana's statute governing the imposition of life without parole and the death penalty provided that the jury would make a sentencing recommendation, but that the trial court was assigned the responsibility for determining the sentence and it was not bound by the jury's recommendation. Ind. Code § 35-50-2-9 (2001). On March 26, 2002, the legislature amended the statute "[f]or a defendant sentenced after June 30, 2002," and declared: "If the jury reaches a sentencing recommendation, the court shall sentence the defendant accordingly." Ind. Code § 35-50-2-9(e).

Pruitt contends that application of the amended penalty statute violates Article I, § 10 of the Constitution of the United States, which provides in part: "No State shall . . . pass any . . . *ex post facto* Law." For the reasons given in Helsley v. State, 809 N.E.2d 292, 300-01 (Ind. 2004), we reject this contention. Accord Stroud v. State, 809 N.E.2d 274, 288 (Ind. 2004); Ritchie v. State, 809 N.E.2d 258, 264 (Ind. 2004).

D. *Jury "Recommendation" Under the Sixth and Eighth Amendments*

If the jury determines that a sentence of death or life without parole is appropriate, Indiana Code section 35-50-2-9(e) (2004) states: "the jury shall recommend to the court" the appropriate penalty, if any, and "[I]f the jury reaches a sentencing recommendation, the court shall sentence the defendant accordingly." Pruitt first contends that the statute provides that the jury "recommends" a sentence, but the court is actually making the sentencing determination. Pruitt contends this is prohibited by Ring. That argument may have had force before the current version of the law. The 2002 amendment to section 9(e) removed the independent judicial sentencing determination by the court. Despite retaining "recommends" as a description of the jury's function, the statute now dictates that the jury decides the sentence, and only if the jury is unable to reach a recommendation, is the trial judge authorized to decide the sentence. Stroud, 809 N.E.2d at 287 ("Under the new statute . . . there is only one sentencing determination, which is made by the jury, and the judge must apply the jury's determination.").

Pruitt next contends that the "recommendation" language leads the jury to believe that the final determination rests elsewhere. In Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985), the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere . . . ." In Caldwell, the prosecutor urged the jurors to view themselves as "taking only a preliminary step towards the actual determination of the appropriateness of death—a determination which would eventually be made by others and for which the jury was not responsible." Id. at 336. The Court stated "one can easily imagine that in a case in which the jury is divided on the proper sentence, the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in." Id. at 333. Pruitt argues that even if the jury does make the sentencing determination, the language of the death penalty statute misleads the jury to believe that it is not the ultimate decision maker. Although the statute retained "recommends" from the earlier pre-Ring version, at Pruitt's trial neither the parties nor the court used the word "recommend" in argument or in instructions.[4] Thus, there is no evidence that the court or prosecutor misled the jury. To the contrary, the jury was instructed: "Your verdict determines whether Tommy R. Pruitt will receive a sentence of death, life without parole, or a term of years. The Judge must sentence Tommy R. Pruitt according to your verdict." The instructions to the jury adequately informed the jury of the importance of their role. We find no constitutional violation.

### III. Motion to Suppress

Pruitt was given painkillers in the intensive care unit at Wishard Health Services because he required surgery as a result of the eight shots he received in the exchange with Deputy Starnes.[5] The following morning, at 3:15 a.m., Pruitt gave a tape-recorded confession to Officer

---

[4] Pruitt also contends that the court's instruction "rewrote" the statute by omitting the term "recommendation." He suggests this judicial effort violated Article IV, Section 1, of the Indiana Constitution ("The Legislative authority of the State shall be vested in the General Assembly . . . .") in an effort to avoid constitutional infirmity. We think the instruction was consistent with the statute, and accordingly find no merit in this claim.

[5] During surgery, Pruitt received thirty milligrams of ketamine and ten milligrams of morphine. He received another twenty milligrams of morphine between 6:10 p.m. and 8:30 p.m. Between 10:00 p.m. and 9:00 a.m., Pruitt received an additional forty milligrams of morphine.

Rick Lang. Lang began the interview by informing Pruitt of his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966). Lang asked Pruitt if he understood these rights and Pruitt responded, "yeah." Pruitt then confessed to shooting Officer Starnes.

Pruitt moved to suppress his confession, contending that his statement was involuntary because of his injuries and the subsequent surgeries and medications. He also contends his statement was given without a knowing waiver of his Miranda rights. Both claims were raised under both the federal and Indiana constitutions. The trial court denied the motion and a redacted version of the tape-recorded confession was played to the jury.

If a defendant challenges the voluntariness of a confession under the United States Constitution, the state must prove the statement was voluntarily given by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 167-69 (1986) (voluntariness of waiver of Miranda rights); Lego v. Twomey, 404 U.S. 477, 488-89 (1972) (voluntariness of a confession). Thus, a federal constitutional claim that a confession was not voluntarily given is governed by a preponderance of the evidence standard. Henry v. State, 738 N.E.2d 663, 664 n.1 (Ind. 2000). However, the Indiana Constitution requires the state to prove "beyond a reasonable doubt that the defendant voluntarily waived his rights, and that the defendant's confession was voluntarily given." Miller v. State, 770 N.E.2d 763, 767 (Ind. 2002) (quoting Schmidtt v. State, 730 N.E.2d 147, 148 (Ind. 2000)).

A. *Voluntary Statement*

In evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including: "the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." Id. (citations omitted); see also Scalissi v. State, 759 N.E.2d 618, 625 (Ind. 2001) (considering influences such as alcohol, drugs, and fatigue to voluntariness). On appeal, we do not reweigh the evidence but instead "examine the record for substantial, probative evidence of voluntariness." Schmitt, 730 N.E.2d at 148. We examine the evidence most favorable to the state, together with the reasonable inferences that can be drawn therefrom. Richey v. State, 426 N.E.2d 389, 392 (Ind. 1981). If there is substantial evidence to support the trial court's conclusion, it will not be set aside. Id.

24

If voluntariness of a statement is challenged on the basis that the defendant was under the influence of drugs, the defendant has the burden to introduce evidence from which it could be concluded that the amount and nature of the drug consumed would produce an involuntary statement. Layton v. State, 261 Ind. 251, 253-54, 301 N.E.2d 633, 635 (1973). The mere fact a statement is made by the defendant while under the influence of drugs, or that the defendant is mentally ill, does not render it inadmissible per se. Brewer v. State, 646 N.E.2d 1382, 1385 (Ind. 1995). Intoxication, drug use and mental illness are only factors to be considered by the trier of fact in determining whether a statement was voluntary. Id.; George v. State, 397 N.E.2d 1027, 1031 (Ind. Ct. App. 1979).

Pruitt contends that the trial court erred when admitting his confession despite his mental capacities and his medicated state when the confession was elicited. A defendant must show specific instances where his impaired abilities have an effect on voluntariness in order for a defendant to prevail on a claim that his mental condition prevented him from knowingly waiving his Miranda rights. Jackson v. State, 735 N.E.2d 1146, 1154 (Ind. 2000); Rhodes v. State, 698 N.E.2d 304, 308-09 (Ind. 1998). However, per our discussion of Pruitt's mental capacities in Parts II and III of this opinion, Pruitt is left to argue that his statement was not given voluntarily because his confession was elicited soon after he underwent surgery for serious injuries and while he was under the influence of pain medication.

When a defendant claims he was under the influence of drugs at the time he made a statement, "the degree of his mental impairment is of critical importance." Whitehead v. State, 511 N.E.2d 284, 293 (Ind. 1987). In the context of drunkenness, this Court has stated that it is only when an accused is so intoxicated that he is unaware of what he is saying that his confession will be inadmissible. See Williams v. State, 489 N.E.2d 53, 56 (Ind. 1986). Intoxication of a lesser degree goes only to the weight to be given the statement and not to its admissibility. Id. In Brewer v. State, 646 N.E.2d 1382, 1385 (Ind. 1995), this Court held that though the defendant was under the influence of drugs and severely mentally ill these facts were insufficient under the totality of the circumstances to require the exclusion of defendant's statement. Similarly, in Pettiford v. State, 619 N.E.2d 925, 928 (Ind. 1993), this Court held that though a defendant's mental condition was relevant to the issue of susceptibility to police coercion, since the defendant made the confession without police coercion, the confession was not rendered

25

involuntary by virtue of the fact that defendant was under some mental delusions at the time of the confession. However, in Brewer and Pettiford the defendants did not present evidence that would show that they were under the influence of the drugs when they gave their confession.

In this case, Dr. Arnold testified that when giving his confession, Pruitt was in extreme pain and not cognizant or competent. The drugs being used to regulate Pruitt's pain can cause "disagreeable dreams," "hallucinations," "delirium," "drowsiness, changes in mood and mental clouding." Dr. Arnold also testified that an individual can appear normal while under the influence of these drugs. The effects of the drugs given to Pruitt can last from four to six hours. However, after reviewing Pruitt's medical records and listening to the statement, Dr. Furbe testified that Pruitt was cognizant at the time of the interview.

In Smith v. State, this Court recognized that a defendant's mental state is not enough to render a confession inadmissible in the absence of coercive police activity. 689 N.E.2d 1238, 1246 n.11 (Ind. 1997) (citing Connelly, 479 U.S. at 165-66). Viewing the evidence most favorable to the state, we determine that Pruitt's pain medication did not substantially undermine his ability to waive his rights and provide the police with a statement. There was no proof of threats, violence, promises, or use of improper influence. The trial court did not err when determining that the state satisfied its burden to show voluntariness.

B. *Waiver of* Miranda *Rights*

Pruitt also contends that his waiver of his right to counsel and to remain silent was not knowingly and intelligently made because he was isolated, injured, and immobilized in intensive care while under the effects of drugs. In Johnson v. Zerbst, 304 U.S. 458, 464 (1938), the Supreme Court held that the waiver of the right to counsel must demonstrate an "intentional relinquishment or abandonment of a known right." Article I, Section 13, of the Indiana Constitution affords Indiana's citizens greater protection than its federal counterpart. Ajabu v. State, 693 N.E.2d 921, 929 (Ind. 1998). Depending on the circumstances, the Section 13 right to counsel, unlike the Sixth Amendment, attaches prior to the filing of formal charges against the accused. Id.; Suter v. State, 227 Ind. 648, 88 N.E.2d 386, 390 (1949); see also Taylor v. State, 689 N.E.2d 699, 703-04 (Ind. 1997).

26

In <u>Mincey v. Arizona</u>, 437 U.S. 385, 396-402 (1978) the Court held that the defendant's confession was involuntary when the defendant was subject to a four-hour interrogation while incapacitated and sedated in an intensive care unit despite the defendant's repeated requests for a lawyer. Pruitt argues that his confession was similarly involuntary since he too was incapacitated and sedated in an intensive care unit. However, unlike Mincey, Pruitt never requested counsel. In the absence of circumstances not present here, a request is required to trigger the Indiana constitutional right to counsel and preclude further questioning of the suspect in custody. <u>Ajabu</u>, 693 N.E.2d at 928, n.4; <u>but see</u> <u>Malinski v. State</u>, 794 N.E.2d 1071, 1079 (Ind. 2003) (recognizing a right to counsel when an attorney hired by the defendant's family was present at the jail, even though the defendant did not specifically request an attorney). In this case, there was no request for counsel.

In this case, after being told by the nurse that Pruitt was awake and alert, Lang asked the nurse if he could speak with Pruitt. The nurse asked Pruitt if Lang could speak with him and Pruitt acquiesced. Pruitt was informed of his <u>Miranda</u> rights, and he indicated that he understood them. During the time surrounding the taped interview, the nurse described Pruitt as alert, oriented, and giving appropriate responses. The nurse did not observe any significant effect of the medication on his mental status. After reviewing the record, we find substantial evidence in support of the trial court's ruling that Pruitt knowingly and intelligently waived his rights.

### IV. Admissibility of Photograph

The trial court admitted a photograph of Starnes taken before an autopsy depicting a surgical wound and "the dullness of the fatty pad over the abdominal contents," that resulted from both the gunshot wounds and surgical manipulation. It also showed the extreme swelling of the body as a result of impairment of Starnes's kidneys due to sepsis.

Pruitt objected to the photograph, arguing that it would arouse the passions of the jury and this prejudice would outweigh the probative value of the photograph. The photograph was exhibited to the jury for approximately 1.5 minutes in the course of an explanation by the state's expert, Dr. Pless, of Starnes's injuries and the locations of the gunshot wounds.

27

The state asserts that apart from illustrating Dr. Pless's testimony, the photograph also provided a visual supplement to the testimony of the doctors who treated Starnes in the hospital.[6] We assume the photograph was disturbing to some jurors.[7] Generally photographs depicting injuries of a victim or demonstrating the testimony of a witness are relevant and admissible. Allen v. State, 686 N.E.2d 760, 776 (Ind. 1997); Ind. Evid. R. 401 and 402. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, . . . or needless presentation of cumulative evidence." Evid. R. 403. On appeal, a claim of error in the admission or exclusion of evidence will not prevail "unless a substantial right of the party is affected." Evid. R. 103(a). Whether an appellant's substantial rights are affected is determined by examining the "probable impact of that evidence upon the jury." Corbett v. State, 764 N.E.2d 622, 628 (Ind. 2002). Because the balance of prejudice and probative value of evidence falls within the sound discretion of the trial court, this Court reviews the admission of photographic evidence only for abuse of discretion. Ealy v. State, 685 N.E.2d 1047, 1049-50 (Ind. 1997).

Pruitt concedes that a gruesome photograph is permitted if it is an accurate representation of what it purports to represent. McNary v. State, 460 N.E.2d 145, 148 (Ind. 1984). However, autopsy photographs have been held inadmissible because the jury could infer that the defendant is responsible "for the cuts, incisions, and indignity of an autopsy." Allen, 686 N.E.2d at 776 (quoting Loy v. State, 436 N.E.2d 1125, 1128 (Ind. 1982)). Pruitt argues that the pre-autopsy photograph is similar to an autopsy photograph because it shows Starnes's body bloated with 100 pounds of extra fluid and a large incision that exposes internal organs. Pruitt contends that the prejudicial effect lingered through both the guilt and penalty phases of the trial. After reviewing the photograph and the evidence surrounding its admission, we conclude that the trial court was within its discretion in deciding that the photograph's probative value in showing the several day

_____

[6] The jury heard detailed testimony from three doctors regarding anatomy and the surgeries performed on Starnes. Dr. Pless's testimony made clear that the large incision depicted in the photograph was one done by the surgeons.

[7] After its showing, Pruitt's lawyers stated for the record their accounts of the reactions of a few of the jurors, which included tears, looking down and away, and distress. The judge stated that he did not notice "any significant reaction from the jurors." Pruitt argues that the arrangement of the courtroom did not allow the judge to view the reactions of the jurors. He urges this Court to find that his attorneys had a better vantage point to observe the jurors furthest from the judge. We assume the accuracy of their accounts for purposes of this opinion.

process of the disease from the time of injury to the time of death was not outweighed by a tendency to inflame or prejudice the jury.

## V. Jury Instruction on Executive Clemency Powers

Indiana Code section 35-50-2-9(d) (2004) requires the trial court to instruct the jury before the sentencing on "the statutory penalties for murder and any other offenses for which the defendant was convicted, the potential for consecutive or concurrent sentencing, and the availability of good time credit and clemency." Pruitt argues that the trial court's instruction in this case violated the Eighth Amendment to the United States Constitution and Article 1, Section 16 of the Indiana Constitution by diminishing the jurors' sense of responsibility for their verdict. The jury was instructed: "The Governor of Indiana has the power, under the Indiana Constitution, to grant a reprieve, commutation, or pardon to a person convicted and sentenced for murder. A pardon completely eliminates a conviction and sentence. A commutation reduces the sentence, for example by changing a death sentence to one for life without parole or for a term of imprisonment. A reprieve is a temporary postponement of the execution of a sentence. The Indiana Constitution leaves it entirely up to the discretion of the Governor when and how to use this power."

In California v. Ramos, 463 U.S. 992 (1983), the Supreme Court discussed the constitutionality of California's statutory requirement that capital sentencing juries be instructed that the Governor could commute a sentence of life imprisonment without possibility of parole, resulting in a lesser sentence that included the possibility of parole. The Court recognized the instruction given in Ramos was both accurate and relevant to a legitimate state penological interest, specifically a concern for the future dangerousness of the defendant should he ever return to society. Id. at 1001-06. The Court noted "California reasonably could have concluded that, while jurors are generally aware of the Governor's power to commute a death sentence . . . most jurors would not be aware that the Governor also may commute a sentence of life imprisonment without possibility of parole and that they should be so informed to avoid any possible misconception conveyed by the description of the sentencing alternative." Id. at 1003 n.18.

29

Ramos establishes that a court can constitutionally inform a jury of the possibility that clemency may affect a sentence of life without parole, and the Indiana statute directs this may be done. Pruitt argues that it does not follow that a trial judge can tell the jury about clemency in death penalty sentences because, he contends, the jury already knows of the Governor's power to commute the death sentence. Ramos also explicitly addressed this point, holding there is no "federal constitutional infirmity in giving an instruction concerning" the Governor's power to commute a death sentence. Id. at 1012 n.27.

In Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985), the Supreme Court affirmed its holding in Ramos, but held that the Eighth Amendment was violated when the jury was led to believe that its decision was only a preliminary step in the ultimate decision of life or death because of the availability of appellate review. Unlike the possibility of the Governor's commuting a murder sentence, the availability of appellate review "is not linked to any arguably valid sentencing consideration." Caldwell, 472 U.S. at 336. The Court found appellate review to be "no valid basis for a jury to return such a sentence if otherwise it might not," and "simply a factor that in itself is wholly irrelevant to the determination of the appropriate sentence." Id. In Justice O'Connor's concurring opinion in Caldwell, she emphasized that in her view the statement was unconstitutional because of the inaccuracy of the prosecutor's closing statements with respect to the possibility of appellate review. See id. at 342 ("[T]he prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility"). Caldwell did not suggest that the Federal Constitution prohibits the giving of accurate instructions regarding post-sentencing procedures. Romano v. Oklahoma, 512 U.S. 1, 15 (1994) (O'Connor, J., concurring). Here there was no inaccuracy and Pruitt's argument fails for that reason.

## VI. Excluded Witness

Pruitt's attorney contacted the hospital to obtain Starnes's medical records, but did not receive all the medical documents, including information about a hole in Starnes' esophagus, until the last day any possible medical malpractice claim could be brought for Starnes's treatment. Pruitt sought to rebut the state's contention that the hospital did everything it could to

30

save Starnes's life.[8] The trial court granted the state's motion in limine to exclude the hospital's attorney from testifying in the guilt phase of the trial. Pruitt argues that his federal Sixth and Fourteenth Amendment, and Indiana Article I, Section 19, right to present a defense and have the jury determine the law and facts was violated.

Pruitt contends that the attorney's testimony regarding a possible "cover-up" may have allowed the jury to find him guilty of aggravated battery instead of murder, and would have revealed the bias of the three doctors' testimony about their treatment of Starnes. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the [Federal] Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986). In Kubsch v. State, 784 N.E.2d 905, 923-24 (Ind. 2003), we recognized that a criminal defendant has a constitutional guarantee to have a "meaningful opportunity to present a complete defense." There was no claim that Starnes's treatment constituted an intervening cause. The medical records were available to Pruitt. His only complaint is to the circumstances of the apparent delay in providing them.

"Relevant evidence is, 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Id. at 924 (quoting Evid. R. 401). "If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial." 1 McCormick on Evidence § 185, at 637 (John W. Strong ed., 5th ed. 1999). Pruitt did not claim that the ineffectiveness of the doctor's care constituted an intervening cause precluding his criminal liability for murder. We conclude the attorney's testimony was immaterial as to guilt, and thus the trial court did not err in granting the state's motion in limine to exclude this testimony in the guilt phase.

### VII.  Right to Allocution

---

[8] The hospital's attorney testified at the penalty phase that she received a request for the operative reports and a search of all backup data. On May 22, 2003, 55 pages were printed, but were held until the medical records had been checked for information on back-up platters maintained by third party contractors. The hospital sent Pruitt the documents on July 10, 2003, one day before the medical malpractice claim had run. The State contends that the 55 pages did not contain new information, but were simply the electronic version of previous information.

Pruitt next argues that the trial court erred when it required him to exercise his right to allocution before the state's closing argument instead of allowing him to speak to the jury at the close of all of the evidence. Indiana Code section 35-38-1-5 provides in relevant part that the defendant may "make a statement personally in the defendant's own behalf and, before pronouncing sentence, the court shall ask the defendant whether the defendant wishes to make such a statement. Sentence shall then be pronounced, unless a sufficient cause is alleged or appears to the court for delay in sentencing."

Pruitt argues that requiring his opportunity to speak to the jury to take place at the close of his case in the penalty phase allowed the state an opportunity to rebut his claims and this sequence thwarted the purpose of the statutory right to allocution. The purpose of the right to allocution is to give the sentencer an opportunity to consider facts and circumstances relevant to the sentencing of the defendant. Ross v. State, 676 N.E.2d 339, 343 (Ind. 1996). We have noted that "'the most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.'" Id. at 343-44 (quoting Green v. United States, 365 U.S. 301, 304 (1961)). The goal of allocution is accomplished when the defendant has an opportunity to explain his view of the facts and circumstances. Id. at 343.

The timing of the opportunity for a defendant to speak on his or her own behalf is a question that this Court has not explicitly addressed. Pruitt points out that in a non-death case it is customary for the allocution colloquy to occur immediately before the pronouncement of the sentence after the presentation of evidence has concluded. Pruitt argues that his case for mitigation was focused on his mental retardation, mental illness, and brain function, and the state's ability to speak to those factors after Pruitt diminished his allocution right. The trial court has wide discretion as to the order of proceedings subject to specific rule or statute. The statute does not make clear when the right to allocution is to be exercised. Pruitt had an opportunity to speak on his own behalf at the conclusion of his defense, and his statutory right was preserved. We find no reversible error.

## VIII. Appropriateness of Sentence

Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Section 4, of the Indiana Constitution "authorizes independent appellate

review and revision of a sentence imposed by the trial court." Buchanan v. State, 767 N.E.2d 967, 972 (Ind. 2002). This appellate authority is implemented through Appellate Rule 7(B), which before 2002 called for revision of a sentence only if it was "manifestly unreasonable." The rule now provides that this "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."

Pruitt argues that this Court should reduce his sentence because of his limited mental capabilities. Pruitt first contends that damage to the frontal lobe of his brain which controls the higher functions for problem solving, impulse control, processing of information necessary to make good decisions, and adaptive planning cause him to at least be borderline mentally retarded. Thus, he argues that while he may not meet the more stringent standards for mental retardation contemplated by the AAMR and DSM-IV, this Court should find him to be close enough. For the reasons stated in Part I we do not find the penalty of death to be inappropriate for a person of his intellectual functioning.

Pruitt next argues that he suffers from a mental illness and that the death penalty is inappropriate for someone with his condition. A couple of weeks after Pruitt was arrested an Indiana Department of Corrections psychologist diagnosed him as schizophrenic. However, Pruitt's own expert, Dr. Golden, explained that this diagnosis means that the psychologist believed that at one time Pruitt was schizophrenic but at the time of diagnosis he was not actively schizophrenic. Dr. Golden concluded that a diagnosis of schizophrenia was inappropriate for Pruitt. Rather, Pruitt suffered from schizoid or schizotypal personality disorder. Unlike the defendant in Corcoran v. State, 820 N.E.2d 655 (Ind. 2005), it is neither conceded nor proved that Pruitt suffers from a mental illness. Pruitt shot and killed an officer in the line of duty. This is certainly among the most severe circumstances warranting the death penalty.

Sentencing is principally a trial court matter. After considering Pruitt's character as an individual who was able to function and adapt as an adult in society and able to comprehend the wrongfulness of his actions, we reject his contention that death is an inappropriate penalty. We share the Chief Justice's view that the legislature intended to give the jury the final word in the trial court on sentencing under Indiana's death penalty statute. We do not agree that this affects

33

the constitutional power of appellate courts to review and revise sentences. That constitutional provision was added in 1970 in response to the same concerns for uneven sentencing practices that gave rise to the Federal Sentencing Guidelines. See Saylor v. State, 808 N.E.2d 646, 649 (Ind. 2004) ("Indiana expressed a preference for the British tactic of appellate review of sentences, and did not pursue the much more severe restrictions on sentencing discretion imposed on federal courts at roughly the same time in our nation's history by the Federal Sentencing Guidelines"); Serino v. State, 798 N.E.2d 852, 856 (Ind. 2003). The purpose of the express authority to "review and revise" sentences was to "ensure that justice is done in [Indiana] courts and to provide unity and coherence in judicial application of the laws." Pinkler v. State, 266 Ind. 467, 472, 364 N.E.2d 126, 129 (1977). Wide variances in sentencing results are at least as likely to occur in jury sentencing as in sentencing by trial judges. The factual predicates of a sentence—the eligibility for death or life without parole—are reserved to the jury by the Sixth Amendment. Ring v. Arizona, 536 U.S. 584, 589 (2002). But the appropriate sentence, like the weighing function, is not a fact constitutionally required to be committed to the jury's determination. See United States v. Booker, 125 S. Ct. 738, 750 (2005) ("We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."). Accordingly, we think appellate review of a sentence imposed by a jury is appropriate.

## Conclusion

The judgment of the trial court is affirmed.


Sullivan, J., concurs.

Shepard, C.J., concurs in result with separate opinion.

Dickson, J., concurs in result with separate opinion, in which Shepard, C.J., joins.

Rucker, J., dissents with separate opinion.

**Shepard, Chief Justice, concurring in result.**

I join Justice Dickson's views on Part B5 of the plurality opinion. It seems odd at the least to hold that the Supreme Court's declaration that "we leave to the States the task of developing appropriate ways to enforce" the prohibition on executing the retarded, <u>Atkins</u>, 536 U.S. at 317, constituted a command that states are constitutionally bound to definitions adopted by professional groups that do not themselves use the same definition of retardation.

In any event, I write largely to speak about Part VIII on "Appropriateness of Sentence." While I think this Court has been right to regard Article VII, Section 4, as calling upon us to exercise some judgment about the sentences imposed by trial judges, I do not consider it as license to set aside jury decisions on grounds of appropriateness alone. That is the sole claim presented in Argument XIII of Pruitt's brief. When judges were the actual sentencers under Indiana's former scheme, I voted multiple times to review the sentence imposed by the trial judge. Now, I would simply say, the legislature has placed the question of appropriateness in the hands of juries.

**Dickson, Justice, concurring in result.**

As to subpart I(B)(5), I believe that the standard for adaptive behavior should not be linked to the current clinical standards as set forth in the American Psychiatric Association's <u>Diagnostic and Statistical Manual of Mental Disorders</u>, commonly referred to as DSM-IV, and that Indiana's standard for adaptive behavior pursuant to Indiana Code § 35-36-9-2 is not necessarily invalid even if it may be at variance with the Association's currently prevailing views expressed in their latest DSM-IV standards.

With respect to Part VIII, regarding the Court's constitutional power "to review and revise the sentence imposed" under Indiana Constitution Art. 7, § 4, the text of this provision grants only the permissive power, not the duty, to review and revise criminal sentences, and it does not specify any basis or grounds for review. By rule, this Court has implemented the provision using two standards, both requiring restraint and considerable deference to the sentences imposed at the trial court level. From 1978 to 2003, our rule restrictively declared that "[t]he reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender." Former Appellate Rule 17(B)(1) and Appellate Review of Sentences Rule 2. This rule further limited such review by declaring that "[a] sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed." *Id.* Effective January 1, 2003, we modified the grounds for appellate sentence revision to permit it "if, after due consideration of a trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. App. R. 7(B). Thus, for twenty-five years, we applied our constitutional sentence revision power on the basis of manifest unreasonableness, and for only the past two years have we chosen to exercise this power based upon appropriateness.

I agree with the majority opinion that our constitutional power of sentence revision exists regardless whether a sentence is determined by judge or jury, but I caution that whether the standard is appropriateness or some other standard is not a matter of constitutional mandate.

36

There is no constitutional obstacle to the Chief Justice's view that we should leave evaluation of appropriateness to the jury under the legislature's new sentencing scheme.

Under both the current and former standard, we have understood that any revision must be limited to considerations of the character of the offender and the nature of the particular offense committed. Neither standard requires or refers to consideration of sentences of other offenders or offenses, and both standards emphasize the need for appellate restraint and respect for the sentence imposed at trial. Under our present rule, I believe that the "due consideration of the trial court's decision" required by Rule 7(B) should restrain appellate revision of sentences to only rare, exceptional cases.

Shepard, C.J., joins.

**Rucker, Justice, dissenting.**

Because I believe Pruitt has met his burden of demonstrating by a preponderance of the evidence that he is mentally retarded, I would reverse his death sentence and remand this cause with instructions to impose a sentence of a term of years. I therefore respectfully dissent.

In order to be considered mentally retarded, a person must demonstrate "significantly subaverage intellectual functioning" and "substantial impairment of adaptive behavior." Indiana Code § 35-36-9-2. Importantly, both must have been manifested *before* the person became twenty-two years of age. Id. Pruitt's date of birth is March 4, 1962. Appellant's App. at 285. Thus, Pruitt must show by a preponderance of the evidence manifestation of significantly subaverage intellectual functioning and substantial impairment of adaptive behavior prior to March 4, 1984.

### Significantly Subaverage Intellectual Functioning

Intellectual functioning is commonly measured through standardized Intelligence Quotient (IQ) tests. Rogers v. State, 698 N.E.2d 1172, 1178 (Ind. 1998). "'Significantly subaverage intellectual functioning' generally means an IQ of 70 or below, with a margin of error of five points in either direction." Id. at 1178 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed. 1994)) ("DSM-IV"). To demonstrate that he manifested significantly subaverage intellectual functioning, Pruitt presented to the trial court results from various IQ tests and achievement tests administered to him prior to March 4, 1984. For example Pruitt was administered two Lorge-Thorndike group IQ tests. He scored a verbal IQ of 64 and a non-verbal IQ of 65 on the first test administered in March of 1973 (at eleven years of age), and scored a verbal IQ of 64 and a non-verbal IQ of 63 on the second test administered in December of 1976 (at fourteen years of age). See Br. of Appellant at 25; Tr. at 619.

In March 1975 (at thirteen years of age) Pruitt was administered the Otis-Lennon School Ability Test and scored 81. Br. of Appellant at 25; Tr. at 620. Although at least one expert

believed that score was inconsistent with Pruitt's claim that he is mentally retarded, see Tr. at 620 (State's expert, lawyer and practicing psychologist, Dr. George Schmedlen), Dr. Charles Golden, a professor of psychology retained by the defense, testified that the Otis-Lennon score likely overestimates Pruitt's actual IQ by 15 to 25 points because that test is an achievement test gauging a person's learning of school subjects as compared with other students in the same grade. Tr. at 1518, 1546. Because he had been held back two grades in school, Pruitt contends that his achievement test scores, when compared to other persons of the same age, indicate an IQ consistent with the results of the Lorge-Thorndike group IQ tests. Reply Br. of Appellant at 17; see also Tr. at 1555-58.

In April of 1975 Pruitt was administered the Iowa Basic Test, an achievement test, which produced results similar to the results of the Otis-Lennon test. Tr. at 620-21, 1556. Dr. Golden testified that the achievement test results would have been nearly identical to the results of the Lorge-Thorndike had Pruitt's scores been adjusted for his age. See Tr. at 1557-58 (If adjusted for age, Pruitt's scores indicate he has an IQ in a range from 63 to 68).

Finally, in December of 1981 at age 19, Pruitt was administered the Revised Beta intelligence test and scored a 93. Tr. at 620. Apparently there is some disagreement regarding the reliability of this test. Originally designed during World War I to screen recruits and later used in some forensic prison settings, see Tr. at 620, 1229, 1537-38, the Revised Beta was characterized by Dr. Brian Hudson, a clinical neuropsychologist retained by the defense, as "not a utilized test within the community, generally speaking." Tr. at 1230. Dr. Golden testified that the Revised Beta is "not an accurate test, it is not well regarded in the field, and is not well accepted in the field as a general test of intelligence." Tr. at 1541. By contrast, Dr. Schmedlen testified he believes the Revised Beta Test is reliable. Tr. at 660. However, he acknowledged on cross-examination that he did not review the test measurements to determine whether the Revised Beta was in fact reliable. Tr. at 672.

Both the State and Pruitt presented to the trial court the results of a number of IQ tests that were administered after Pruitt reached twenty-two years of age. See, e.g., Wechsler Adult Intelligence Scale administered in April of 2002, Tr. at 612-13; Stanford-Binet IQ test

39

administered in February of 2003, Tr. at 622-23; and the Wechsler Adult Intelligence Scale administered in July of 2003, Tr. at 609. Those tests, on which the trial court relied in part to conclude Pruitt was not mentally retarded, suggest that Pruitt may have a higher level of intellectual functioning than indicated by the results of tests administered before he reached age twenty-two. However the relevant time period in this case is from March 4, 1962 to March 3, 1984. As Dr. Hudson testified, "IQ is meant to be diagnosed in childhood for a reason. It's not meant to be diagnosed in adulthood and then looked back on his childhood to determine if that diagnosis is accurate." Tr. at 1356.

With the exception of the Revised Beta test, which appears to be unreliable, the results of the remaining four tests administered to Pruitt during his youth—two Lorge-Thorndike IQ tests indicating Pruitt fell in the mentally-retarded IQ range, and two academic achievement tests that if adjusted for Pruitt's age indicated Pruitt fell in the mentally-retarded IQ range—show that Pruitt manifested significant subaverage intellectual functioning prior to reaching age twenty-two. In my view Pruitt has carried his burden of proof on this point by at least a preponderance of the evidence.

### Substantial Impairment of Adaptive Behavior

Adaptive behavior refers to how well a person deals with everyday life demands compared to other people with similar educational and social backgrounds. Rogers, 698 N.E.2d at 1178. But like intellectual functioning this behavior must also manifest itself before the person reaches twenty-two years of age. In support of its finding that Pruitt did not manifest "substantial impairment of adaptive behavior," see Ind. Code § 35-36-9-2, the trial court relied primarily upon Pruitt's functioning as a carpenter, his obtaining a commercial driver's license, and his performance of duties of an over-the-road truck driver and filling out applications of employment. Slip op. at 16 (citing Appellant's App. at 575 (Order Denying Finding of Mental Retardation)). However those factors considered by the trial court were manifestations of Pruitt's adaptive behavior *after* he reached twenty-two years of age.

40

I agree with the majority that although Indiana does not adopt a particular clinical definition of adaptive functioning, clinical definitions may provide some guidance as to the type of information useful to the determination of impairment of adaptive behavior under our statute. Slip op. at 17-18 (citing Rondon v. State, 711 N.E.2d 506, 516 n.14 (Ind. 1999); Rogers, 698 N.E.2d at 1178). One such useful clinical definition is found in the DSM-IV, which defines impairment of adaptive functioning as the existence of limitations in at least two of ten areas: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." Rondon, 711 N.E.2d at 516 n.14.

The record before us demonstrates that before age twenty-two Pruitt exhibited several adaptive functioning limitations. For instance, in terms of communication, Pruitt displayed an inability to follow directions: "When playing baseball, he had to be told which way to run every time. . . . [O]nce you've learned the bases once, [it's] pretty much the standard. . . . If you have to be told constantly, that suggests that you have a deficit in your ability to understand what's being told to you." Tr. at 5538; see also Tr. at 1258 ("[Pruitt] did have an extreme amount of difficulty functionally speaking in expressing his needs."). Pruitt also had difficulty as a child understanding concepts involved in playing basketball and playing the game of Monopoly. Tr. at 5538-39. In terms of social skills, as a child Pruitt's peers would ridicule him and he did not understand he was being ridiculed. Tr. at 5541. Pruitt lacked the social skills to develop meaningful relationships, primarily because his disability in communication made it difficult for him to reciprocate communication. "If a conversation is one-sided, what that would suggest is that [Pruitt's] either not understanding or is ignoring what you are saying. In either case, it's dysfunctional . . . ." Tr. at 5540. In terms of self-direction, Pruitt as a child never initiated games or social activities; there is no evidence that Pruitt undertook any self-initiated activities such as hobbies or sports during his childhood. Tr. at 5543. In terms of health and safety, Pruitt often engaged in activities dangerous to himself as a child. Two persons recalled that Pruitt "would handle bees, even though he knew he was allergic to the bees. He was aware of the significant allergic effect he would have if he was stung by a bee; nonetheless, he continued to . . . pick up bees to listen to them buzz, to hear them, to shake them in his hands." Tr. at 5545-46. Pruitt apparently similarly handled snakes. Id. In terms of functional academics, Pruitt was

"retained two years in the first three years of school. He only passed to the 7th grade because he was socially promoted." Tr. at 5546-47. Also, according to Dr. Hudson, although Pruitt did not necessarily exhibit a level of substantial impairment in all areas, he did demonstrate deficits in other functional areas: Pruitt never demonstrated the type of behaviors expected of adults to maintain a domicile before or after twenty-two years of age, and he never worked independent of very stringent supervision because he often could not follow directions or reciprocate communication. Tr. at 5540, 5547-48.

As with the trial court's reliance in part on evidence of Pruitt's subaverage intellectual functioning after March 4, 1984, the trial court also relied on evidence of Pruitt's impairment of adaptive behavior after March 4, 1984. However, if we consider only the evidence of record pertaining to Pruitt's behavior during his youth, then it becomes clear that Pruitt manifested substantial impairment of adaptive behavior prior to reaching age twenty-two. In my view Pruitt has also carried his burden of proof on this point by at least a preponderance of the evidence.

### Conclusion

It is clear to me that Pruitt is mentally retarded even under a standard requiring proof by clear and convincing evidence. Under the relaxed standard the Court announces today, the fact of Pruitt's mental retardation is even more apparent. Accordingly a death sentence is constitutionally and statutorily impermissible in this case. This cause should be remanded to the trial court with instructions to impose a sentence of a term of years.[9]

---

[9] Indiana Code § 35-36-9-7 requires that a defendant determined to be a mentally retarded individual be sentenced under Indiana Code § 35-50-2-3(a), which provides that a defendant convicted of murder shall be imprisoned for a term of years.