**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

May 22 2013, 9:23 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**SCOTT L. BARNHART**
Keffer Gilley Barnhart LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| SHAWN TYLER MILLER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1209-CR-451 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Richard G. D'Amour, Judge
Cause No. 82D02-1009-FB-988

**May 22, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Shawn Tyler Miller appeals his conviction of Criminal Confinement,[1] as a class D felony, presenting the following restated issues for review:

1. Did the trial court err in excluding a photo of the victim taken several weeks after the confinement incident?

2. Did a juror's statement at trial that she was unable to hear a portion of the victim's testimony foreclose the possibility that Miller could receive a fair trial, thus constituting fundamental error and requiring reversal?

3. Did the trial court err in (a) excluding evidence of a prior rape allegation made by the victim, as well as a claim that it led to an abortion, and in (b) admonishing the jury to disregard testimony on those subjects that was placed before the jury before the State's objection thereto was sustained?

We affirm.

The facts favorable to the judgment are that Miller and the victim in this case, A.M.S., began dating in June 2009. Their relationship, which became sexual almost from the outset, continued through the next year – their senior year in high school – and into their freshman year of college. The relationship can fairly be described as stormy. They broke up and reunited several times, and four or five months after the relationship commenced, Miller began hitting A.M.S. A.M.S. admitted that on one occasion, she was the aggressor and slapped him because "he cheated on [her] for like the sixth time." *Transcript* at 175. A.M.S. moved in with Miller in June 2010, but finally ended the relationship in August 2010 because Miller neglected getting her anything to celebrate their anniversary and because she was tired of Miller's abuse. She then moved into an apartment with three other women as she began

---

[1] Ind. Code Ann. § 35-42-3-3 (West, Westlaw current through P.L.76 with effective dates through April 15, 2013).

her freshman year at the University of Southern Indiana.

In September 2010, Miller commenced an effort to reconcile with A.M.S. He bought her a card and texted her multiple times claiming that he had changed and assuring her that he would not hit her anymore. Eventually, A.M.S. agreed to meet Miller at his apartment so they could talk. She also told him she would bring clothes and personal items still in her possession that belonged to him. She arrived at his apartment at about 11:30 p.m. on September 27, 2010. Miller let her in and the two went upstairs to Miller's bedroom. The two walked into Miller's bedroom and Miller locked the bedroom door. Miller told A.M.S. "that [she] had F'd up and that [she] was going to pay for it." *Id.* at 100. A.M.S., who was sitting on the bed at that point, just laughed. Miller then approached her and "started yelling at [her] and saying that [she] had F'd up and that [she] shouldn't do it again. " *Id*. at 101. By "F'd up", A.M.S. understood Miller as referring to "talking to people [she] shouldn't be talking to" and breaking up with him. *Id*. At that point, Miller asked A.M.S. for her cell phone and she refused. Miller wanted to see the phone because he thought A.M.S. was talking to another guy on the phone and texting with him when she arrived at Miller's house. He wanted to "check [A.M.S.'s] text messages and stuff because that's what he did when [they] were in high school." *Id*. at 102. A.M.S. refused to give Miller the phone and he tried to take it from her. When she resisted, Miller hit her two or three times, after which she hit him in the jaw with her hand. He finally managed to wrest the phone from A.M.S.'s hand and began to review her text messages. According to A.M.S., "For every text message that he saw from the guy I was talking to, my roommates, I got hit." *Id*. at 103. When Miller

3

struck her, he used his fist. Miller struck her five to ten more times during this part of the incident.

At that point, A.M.S. picked up her purse to look for something in it, which angered Miller even more, and he grabbed the purse from her and threw it on the floor and laughed. Miller continued to read the text messages on A.M.S.'s phone and once again began hitting her. By this time, A.M.S. was on the floor curled up in a ball in an attempt to protect herself. Miller started kicking her as well. When A.M.S. stood up, he grabbed her by the throat and squeezed for thirty to forty-five seconds. A.M.S. asked to leave and Miller said no. At trial, A.M.S. testified that at this point, Miller committed anal rape against her. Eventually, A.M.S. asked Miller to give her phone back and told him she wanted to leave. Miller told her that she would not be allowed to leave and that she was going to spend the night. He read more of her texts and told her "that was gonna end" and then he hit her in the cheek bone. *Id*. at 114. She eventually persuaded Miller to let her leave by promising that she would come back the next day. She left and drove back to her apartment. A.M.S. estimated that by the time she left, Miller had struck her forty to fifty times.

When she arrived at her apartment, A.M.S.'s roommates observed that she had bruising on her neck, eye, arms and legs, a big knot on her elbow, and that she was shaking and crying. When A.M.S. told them what had happened, her roommates convinced her to go to the hospital. In the emergency room, A.M.S. told the doctor that she had been beaten and raped. She also called her parents and asked the hospital to call the police. Detective Nathan Schroer of the Evansville Police Department responded to the call and spoke with A.M.S.

4

He also spoke with Miller later that morning.

As a result of the investigation, the State charged Miller with criminal deviate conduct and criminal confinement. Following a jury trial, Miller was found guilty of criminal confinement and not guilty of criminal deviate conduct.

1.

At trial, Miller sought to introduce a Facebook photo of A.M.S. that was taken several weeks after the incident. The photo depicts A.M.S. dancing and pulling up her shirt, exposing her abdomen. Miller claimed the photo was relevant to show "there [were] no visible injuries on certain parts of her body two (2) weeks or so after the … incident." *Id*. at 167. The State objected to the photo on grounds that the prejudice (the photo "depicts a nineteen (19) year old girl with her shirt half off dancing") outweighed its probative value ("it's not even a good quality picture to see whether or not there are bruises"). *Id*. at 167-68. Miller contends the trial court erred in excluding the photo.

A trial court is afforded wide discretion in ruling on the admissibility and relevancy of evidence. *Nicholson v. State*, 963 N.E.2d 1096 (Ind. 2012). We review evidentiary rulings for abuse of discretion and will reverse only when the decision is clearly against the logic and effect of the facts and circumstances. *Id*. "'A claim of error in the exclusion or admission of evidence will not prevail on appeal unless the error affects the substantial rights of the moving party.'" *Id*. at 1099 (quoting *McCarthy v. State,* 749 N.E.2d 528, 536 (Ind. 2001)).

The stated reason at trial for introduction of the photograph was Miller's assertion that it contradicted A.M.S.'s claim that she had suffered bruising injuries as a result of Miller's

5

actions. We have reviewed the photo and agree with the trial court's assessment that "the quality of this photo is extremely poor", at least for the purpose for which it was offered. *Transcript* at 168. It is doubtful that the sort of bruising A.M.S. suffered (as depicted in other photos taken of the victim shortly after the incident) would even be visible in a photo of this quality. Moreover, there was never a claim that A.M.S. suffered bruising to her abdomen. The probative value of the photo[2] was thus very minimal and was easily outweighed by its potential prejudicial impact. The trial court did not err in excluding the photo.

2.

The trial court interrupted the proceedings during the trial testimony of A.M.S. to determine how much longer they would go that evening. The court asked the jurors whether it was convenient for them to stay another hour. Juror No. 8 made the following comment: "If we continue can she speak up I haven't been able to hear about three fourths of what she is saying that's good (inaudible) I've lost a lot of testimony because of it." *Id.* at 125. Miller contends that Juror No. 8's inability to hear rendered it impossible for Miller to receive a fair trial and that such constituted fundamental error and requires reversal.

This court addressed a very similar argument in *Lewis v. State*, 726 N.E.2d 836, 845 (Ind. Ct. App. 2000), *trans. denied*. In *Lewis*, the defendant complained that fundamental

---

[2] We note here that Miller also argues on appeal that the photo was relevant because A.M.S.'s demeanor in the photo was inconsistent with that of a person who had recently been raped. Miller did not make this argument to the trial court when he sought to introduce the photo into evidence. Generally, a party may not argue one basis at trial and argue a different basis on appeal. *Houser v. State,* 823 N.E.2d 693 (Ind. 2005). Such a claim raised for the first time on appeal is waived. *Id*. Accordingly, Miller waived this argument.

error had occurred because some of the jurors were unable to hear portions of the trial testimony. Specifically, two jurors indicated that not only were *they* having difficulty hearing portions of the testimony from the State's witnesses, but that others were as well. Lewis claimed his due process and confrontation rights were violated because the jurors did not hear all of the testimony. The *Lewis* court acknowledged that in order to properly perform their duty, jurors must be able to hear the testimony of witnesses. Citing *Mann v.* State, 251 Ind. 145, 239 N.E.2d 696 (1968), however, the court noted that "the fact that jurors indicated that they had difficulty hearing does not, of itself, mandate that a defendant's conviction be vacated." *Id.* at 845.

On appeal, the *Mann* defendant had argued that he was entitled to reversal because the jurors had not been able to hear the witnesses. Our Supreme Court held that in failing to request a mistrial or otherwise object at trial, the defendant had waived the issue. In so holding, the Court noted that "the trial judge used extra precaution to have witnesses repeat answers and to request all parties involved including the jurors to immediately notify the trial court if there was any doubt as to what witnesses stated or what was transpiring." *Mann v. State*, 251 Ind. at 146, 239 N.E.2d at 697. Citing this aspect of *Mann,* the *Lewis* court rejected the defendant's claim of fundamental error because that judge also "took precautions to ensure that the jurors could hear the testimony … [and] "instructed the jurors to notify [the court] by raising their hands if they could not hear." *Lewis v. State*, 726 N.E.2d at 845.

In the present case, when apprised of the jurors' difficulty in hearing A.M.S.'s testimony, the court stated:

7

[A.M.S.] that is a problem okay and I this is nothing that, uh, uh, you know, it's embarrassing to you we all understand that okay but you do have to speak up because if they can't hear you, you know, we've got a serious problem and the people over there, the lawyers need to be able to hear you and the people that are out in the audience need to hear you so even though I understand, uh, the embarrassment you got to make sure that we can hear okay so I'm going to continue to remind you, uh, and *if you're having problems please let me know by raising your hand* and … and we'll try to address that issue. This doesn't make your voice louder okay it just runs to the recording device so you are going to have to speak up.

*Transcript* at 125 (emphasis supplied). From context, we think it obvious that although most of the court's comments were directed at the witness, the highlighted comment was directed at the jurors. As in *Lewis* and *Mann*, the trial court here instructed the witness to speak loudly enough to be heard and urged the jurors to inform the court if they had difficulty hearing the witnesses thereafter. Therefore, we reach the same result that the courts did in *Lewis* and *Mann*: there was no fundamental error and the argument is waived.

3.

Prior to trial, the State filed a motion in limine seeking the exclusion of any evidence concerning the victim's prior sexual history. The trial court granted the motion. Miller's counsel violated the ruling on the motion in limine during direct examination of a defense witness. Miller contends the trial court erred in sustaining the State's objection to testimony elicited by Miller in violation of the ruling on the motion in limine and in admonishing the jury to disregard the testimony in question.

"The purpose of a motion in limine is to prevent the display of potentially prejudicial material to the jury until the trial court has the opportunity to rule on its admissibility." *Lehman v. State*, 777 N.E.2d 69, 71 (Ind. Ct. App. 2002). The State filed a motion in limine

8

asking the court to exclude evidence of A.M.S.'s prior sexual history. When arguing in favor

of the motion, the prosecuting attorney stated:

> At deposition a certain fact was questioned among several witnesses, uh, that fact being that the alleged victim in case [sic], [A.M.S.], uh, aborted a pregnancy during high school. … I'm objecting to the introduction of this evidence, I think it's evidence of prior sexual history, uh, it isn't relevant to the case at bar, it does appear to be excluded under Rule 412, uh, even though the, uh, punitive [sic] father of the aborted pregnancy would be the Defendant. So I'm asking the Court to order the defense not to ask about that aborted pregnancy or bring it up in any way.

*Transcript* at 58. When asked for a response to the State's request and comments, defense

counsel replied, "Uh, no response." *Id*. at 59. The trial court granted the State's motion and

instructed Miller's counsel "not [to] bring forth any evidence of the alleged victim having

aborted a pregnancy." *Id*.

During the direct examination of defense witness Skyler Fritz, defense counsel asked

how Fritz knew A.M.S. and Fritz responded that they had been co-workers at a Papa John's

restaurant. Counsel then asked, "Did she tell you that, uh, that she got pregnant as a result of

being raped?" *Id*. at 359. Fritz responded in the affirmative. Counsel asked, "And that she

then had an abortion to end that pregnancy?" *Id*. The State immediately objected and the

trial court excused the jury from the courtroom. Outside the presence of the jury, the trial

court reminded defense counsel of the order on the motion in limine concerning the alleged

abortion. Defense counsel apologized, explaining, "I had forgotten that that motion was filed

it was filed at the last minute before trial, uh, and I apologize that I had overlooked that." *Id*.

at 360. Counsel then proceeded to argue the merits of the ruling, contending that such

evidence was admissible because it was not offered to reflect on A.M.S.'s prior sexual

9

conduct, but instead meant to show that A.M.S. had not, in fact, had an abortion as she claimed, but instead that "the evidence has been that the sex was anal sex, there could have been no pregnancy and no abortion." *Id.*

We conclude that even assuming, without deciding, that the trial court erred in excluding the evidence, the error was harmless. We reiterate that questions concerning the admissibility of evidence are committed to the trial court's discretion and will be reversed only for an abuse of discretion. *Nicholson v. State*, 963 N.E.2d 1096. A claim of error in the admission or exclusion of evidence will not result in reversal, however, "unless a substantial right of the party is affected." Ind. Evidence Rule 103(a). We determine whether an appellant's substantial rights are affected by examining the "probable impact of that evidence upon the jury." *Pruitt v. State,* 834 N.E.2d 90, 117 (Ind. 2005), *cert. denied*, 548 U.S. 910 (2006).

After the trial court sustained the State's objection and the jury was brought back into the courtroom, defense counsel continued to question Fritz on the subject of A.M.S.'s credibility. Fritz replied that, in her opinion, "[A.M.S.] is not a truthful person." *Transcript* at 364. She further testified that A.M.S. did not have a reputation for telling the truth. The defense also called four other witnesses who testified that A.M.S. did not have a reputation for being truthful. By defense counsel's own admission, the primary reason for questioning Fritz about A.M.S.'s alleged prior claim of rape was to impugn A.M.S.'s credibility. Counsel was able to do so not only through Fritz's admissible testimony, but also through the testimony of four other people called primarily for that purpose. Thus, the probable impact

of the excluded testimony upon the jury's assessment of A.M.S.'s credibility would have been minimal. We note in this regard that the jury did not seem inclined to credit A.M.S.'s entire account of the events of that evening, because it acquitted Miller of the criminal deviate conduct charge, which seemed to turn primarily upon the question of whether A.M.S. consented to the anal sex that the evidence conclusively demonstrated occurred between the two.

Judgment affirmed.

ROBB, C.J., and CRONE, J., concur.