ATTORNEYS FOR APPELLANT
Thomas W. Vanes
Merrillville, Indiana

Mark A. Bates
Crown Point, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ian A.T. McLean
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



**FILED**
May 13 2014, 10:09 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

No. 45S03-1309-CR-597

MCLYNNERD BOND, JR.,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Lake Superior Court, No. 45G03-1102-MR-2
The Honorable Diane Ross Boswell, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 45A03-1205-CR-212

**May 13, 2014**

**David, Justice.**

Let us all hope that the dark clouds of racial prejudice will soon pass away and the deep fog of misunderstanding will be lifted from our fear drenched communities . . . .

Dr. Martin Luther King, Jr., Letter from Birmingham Jail (April 16, 1963). Dr. King's letter expressed, in measured optimism, a desire to see a country free of racial discrimination. Writing while in jail for protesting racism and segregation in Birmingham, Alabama, he also noted the "interrelatedness" of instances of racial inequity. "Injustice anywhere is a threat to justice everywhere," he said. "Whatever affects one directly, affects all indirectly." It is in service to this truth that we approach our opinion today.

In this case, a police detective interrogated an African-American murder suspect. We have long held that law enforcement officers conducting interrogations may use a range of tactics and techniques to persuade suspects to provide incriminating statements. And we understand that simple question-and-answer methods will not always be successful. But the flexibility afforded to law enforcement is still bound by state and federal constitutional protections.

Over the course of several hours the detective here employed a number of interrogation techniques to convince the suspect to admit his guilt. Most of these techniques were acceptable. But when he implied that the suspect's race precluded him from receiving a fair trial and an impartial jury, he went too far.

**Facts and Procedural History**

A detective from the Gary Police Department was investigating a cold case murder from 2007. During the course of an unrelated investigation in 2009, he received a tip that McLynnerd Bond, Jr. was responsible for the 2007 murder. On February 12, 2011, the detective learned that Bond was in custody at the Gary Police Department on outstanding county warrants. He brought Bond into an interrogation room to question him about the 2007 murder.

The detective read Bond his <u>Miranda</u> rights, which Bond waived.[1]  For three hours, Bond consistently and adamantly denied being involved in the murder.  The detective's interrogation approach was to convince Bond that the police knew he was guilty and the only thing Bond could do to mitigate this was to admit guilt.  The detective implied he could help Bond achieve a better outcome if he confessed—hinted that he might get a lesser-included charge than murder— and that Bond could see his children and talk to his mother if he cooperated.  And a little over two hours into the interrogation, the detective told Bond, who is African American,

> [d]on't let twelve people who are from Schererville, Crown Point—white people, Hispanic people, other people that aren't from Gary, from your part of the hood—judge you.  Because they're not gonna put people on there who are from your neck of the woods.  You know that.  They're not gonna be the ones to decide what happens to you.  You know that.  I know that. Everybody knows that.  All they're gonna see is, oh, look at this, another young motherf***** who didn't give a f***.

(Appellee's Ex. 1.)  After three hours, most of which was spent tucked into a corner of the interrogation room with the detective almost directly in his face, Bond broke.  He told the detective that he committed the 2007 murder.

On February 25, 2011, the State charged Bond with murder.  He filed a motion to suppress his statement, claiming that it was involuntarily given in violation of the Fifth Amendment to the U.S. Constitution and Article 1, § 14 of the Indiana Constitution.  After a two-day hearing in which the detective and Bond both testified, the trial court denied Bond's motion.  It noted, however, that "[t]he suggestion by the detective that the defendant could not receive a fair and impartial jury due to the location of the Courthouse causes great concern to the

---

[1] Bond's interrogation was videotaped, and the State tendered copies of the complete interrogation tape. It is now part of the record on appeal.

Court, and is strongly discouraged." (App. at 6.) Bond sought an interlocutory appeal and the Court of Appeals accepted jurisdiction.

The Court of Appeals affirmed in an unpublished memorandum decision. Bond v. State, No. 45A03-1205-CR-212, 2013 WL 2404071 at *6 (Ind. Ct. App. May 31, 2013). The majority of the panel—like the trial court judge—"d[id] not approve of the comment" made by the detective and considered it "inappropriate," but found that in viewing the interrogation in its entirety, it did not appear that the comment brought about Bond's confession. Id. at *4–5. Judge Kirsch dissented and would have reversed the denial of Bond's motion to suppress because of the detective's comment. Id. at *6 (Kirsch, J., dissenting). We granted transfer, thereby vacating the Court of Appeals decision. Bond v. State, 993 N.E.2d 1149 (Ind. 2013) (table); Ind. Appellate Rule 58(A).

## Standard of Review

When a defendant challenges the voluntariness of his or her confession under the U.S. Constitution, the State must prove the statement was voluntarily given by a preponderance of the evidence.[2] Pruitt v. State, 834 N.E.2d 90, 114 (Ind. 2005). We examine the totality of the circumstances as presented by the record, and are guided by several factors including police coercion; the length, location, and continuity of the interrogation; and the defendant's maturity, education, physical condition, and mental health. Miller v. State, 770 N.E.2d 763, 767–68 (Ind. 2002). "The critical inquiry is whether the defendant's statements were induced by violence,

---

[2] Though Bond premised his motion on both the U.S. and Indiana Constitutions, he does not articulate a distinct argument for his state claim, which would have required the State to meet the higher hurdle of proving voluntariness beyond a reasonable doubt. See Pruitt v. State, 834 N.E.2d 90, 114–15 (Ind. 2005).

threats, promises or other improper influence." Ringo v. State, 736 N.E.2d 1209, 1212–13 (Ind. 2000).

### Discussion

> [T]he Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will."

Jackson v. Denno, 378 U.S. 368, 385–86 (1964) (quoting Blackburn v. Alabama, 361 U.S. 199, 206–07 (1960)). Additionally, there is a "deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." Id. at 386 (quoting Spano v. New York, 360 U.S. 315, 320–21 (1959)).

We agree with the Court of Appeals that the detective's statements implying that a confession would aid Bond's case did not themselves render that confession involuntary. Bond, 2013 WL 2404071 at *4. On several occasions, the detective reinforced to Bond that he could not guarantee a particular outcome or make any specific promise of a result, but he wanted Bond to know that cooperation could be a factor in his case and could influence the detective to be supportive as the case progressed. This is neither a coercive police tactic nor an unexpected one, and we do not view it as having overcome Bond's free will.

We likewise agree that the detective's promises to put Bond in contact with his family if he confessed did not render that confession involuntary. See id. at *5. The detective did not threaten Bond's family with physical harm or legal jeopardy. And, in fact, he followed through

5

with his promises and Bond was able to speak with his girlfriend and mother and see his children.

But with respect to the detective's statement that Bond might not receive a fair trial because of his race and the likely composition of a prospective jury, our sentiment goes beyond the trial court's "great concern" and the Court of Appeals majority's disapproval of it as being "inappropriate." This is not a police tactic that we simply "do not condone" because it is deceptive. Instead, this was an intentional misrepresentation of rights ensconced in the very fabric of our nation's justice system—the rights to a fair trial and an impartial jury, and the right not to be judged by or for the color of your skin—carried out as leverage to convince a suspect in a criminal case that his only recourse was to forego his claim of innocence and confess. And like Judge Kirsch, we condemn it.

This country has waged a long and difficult campaign aimed at ensuring equal access to justice for all its citizens—a campaign whose courtroom aspect has been perhaps marked most visibly by the efforts to ban racial discrimination in jury selection after the enactment of the Fourteenth Amendment. See, e.g., Strauder v. West Virginia, 100 U.S. 303, 308 (1879) (state statute excluding non-white citizens from juries "is practically a brand upon [those citizens], affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others"), abrogated on other grounds by Taylor v. Louisiana, 419 U.S. 522 (1975); Thiel v. Southern Pac. Co., 328 U.S. 217, 227 (1946) ("the color of a man's skin is unrelated to his fitness as a juror"); Batson v. Kentucky, 476 U.S. 79, 86 (1986) ("Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure.") Such a police interrogation technique as we see here flies in the face of those efforts by implying that they were all for naught.

And in a larger sense, purposeful racial discrimination in the justice system is a harm that extends to the community as a whole because it "undermine[s] public confidence in the fairness

of our system of justice."  Id. at 87.  Active discrimination by the State "condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law."  Powers v. Ohio, 499 U.S. 400, 412 (1991).  "Thus, racial discrimination has no place in the courtroom." Addison v. State, 962 N.E.2d 1202, 1217 (Ind. 2012) (internal quotation omitted).  As our own former Chief Justice once put it, one of the "ultimate objectives of our justice system" is to "create a system where all citizens are equal in the eyes of the law."  Randall T. Shepard, *Elements of Modern Court Reform*, 45 Ind. L. Rev. 897, 906 (2012).  And "[f]or citizens to have confidence in the system, they must see people like themselves represented in it at all levels."  Id. This of course includes the jury box.

But despite nearly two hundred years of effort by civil rights activists, legislatures, law enforcement, courts, and others, the perception remains that racial discrimination still exists within our justice system:  from police treatment to jury selection to jury verdicts and sentences. And the perception is especially common within the African-American community.[3]  It defines reality for many African Americans faced with, serving in, or incarcerated by our criminal courts, and unquestionably has roots in our nation's tortured history of race relations.  That there remains such fear or mistrust of the justice system is why all courts must remain vigilant to eradicate any last vestiges of the days in which a person's skin color defined their access to justice.

---

[3] See, e.g., John Sides, *White People Believe the Justice System is Color Blind.  Black People Really Don't*, THE WASHINGTON POST, July 22, 2013, http://www.washingtonpost.com/blogs/wonkblog/wp/2013/07/22/white-people-believe-the-justice-system-is-color-blind-black-people-really-dont/ (normal range of group differences of opinion "pale in comparison to the gulf separating black and white perceptions of justice").  When faced with the statement "courts give all a fair trial," about twenty-five percent of white respondents disagreed; more than sixty percent of African-American respondents disagreed.  Id.

But the detective's comment instead intentionally played on the fear that Bond could not receive a fair trial because of his race. And in doing so, it gave truth to that fear. Whereas we so stridently seek to eliminate the perception that race plays a part in the access to justice, the detective strengthened it by grounding it in reality. He was either implying a return to days of overt racial discrimination or saying that we still live in those days. See, e.g., State v. Haynie, 395 So.2d 669, 675–76 (La. 1981) (sheriff told detained African-American suspect that "you are charged with raping a white woman, and you know a judge and jury won't believe you here in Grant Parish," and so suspect should confess as sign of cooperation). Neither is acceptable.

It is true that Bond would not be entitled to a jury composed entirely of jurors of his own race, or even a jury racially composed in proportion with the racial breakdown of his community. Batson, 476 U.S. at 85; Adams v. State, 431 N.E.2d 820, 822 (Ind. 1982); see also Akins v. Texas, 325 U.S. 398, 403 (1945). "The number of our races and nationalities stands in the way of evolution of such a conception of due process or equal protection." Id. But Bond is absolutely entitled under the U.S. Constitution "to require that those who are trusted with jury selection shall not pursue a course of conduct which results in discrimination in the selection of jurors on racial grounds." Id.; see also Ind. Const. Art. 1, § 13(a).[4]

The detective knew this. It is not clear whether Bond did, but it is clear that he had no experience with the court system or jurors in Crown Point and he took the detective's comment as true—and it made him believe he "was going to do the rest of [his] life in jail."[5] (Tr. at 68–69.)

---

[4] We emphasize that this is not a strict Batson case. There is no indication that a prosecutor actually would have tried to stack a jury against Bond based on race. But the evil Batson sought to remedy is the one that the detective invoked as leverage against Bond.

[5] The Court of Appeals noted that Bond had been read his Miranda rights in support of its conclusion that, considering the totality of the circumstances, Bond's confession was still voluntary in spite of the

8

So today we do not find ourselves reviewing a case in which an officer misled or deceived a suspect as to the evidence held against him, see Kahlenbeck v. State, 719 N.E.2d 1213 (Ind. 1999), or one in which the police falsely claimed that the victim of a murder still lived, see Carter v. State, 490 N.E.2d 288 (Ind. 1986), or one in which police had a good faith basis for making a technically false statement, see Ellis v. State, 707 N.E.2d 797 (Ind. 1999). We have upheld the voluntariness of confessions despite the police deception in such cases.

Instead, in this case Bond was intentionally deceived as to the fairness of the criminal justice system itself because of the color of his skin. Regardless of the evidence held against him or the circumstances of the alleged crime, he was left with the unequivocal impression that because he was African American he would spend the rest of his life in jail. Unless he confessed. And in unfortunate days gone by, this might have been the case. But no one wants to go back to such a time or place in the courtroom, and so we will not allow even the perception of such inequality to enter the interrogation room.

We certainly do not believe that the detective is himself racist or harbors racist tendencies or beliefs. And this misconduct does not rise anywhere near to the terrible level seen in prior

---

detective's comment. Bond, 2013 WL 2404071 at *5. But the Miranda warnings do not address a defendant's right to a fair and impartial jury regardless of race. And we do not intend to suggest that they must, but "[t]he purpose underlying the Miranda warnings is to protect an individual's Fifth Amendment privilege against self-incrimination by placing reasonable limitations on police interrogations," Sauerheber v. State, 698 N.E.2d 796, 801–02 (Ind. 1998), and to effectuate that purpose they warn a suspect specifically as to those limitations. They are not a recitation of the full panoply of constitutional protections available to a suspect or criminal defendant at all stages of the trial process.

So if an officer told a suspect in an interrogation that he could could say anything and it would not be used against him in a subsequent proceeding, we might give the prior Miranda warnings greater weight in considering the totality of the circumstances because those warnings specifically tell a defendant that his statements can be used against him. Here, though, Bond was told that he faced an unfair trial because of his race. Certainly he was warned that he did not have to speak to the detective at all, but nowhere was the misstatement countermanded by the language of the Miranda warnings. As such we do not give the presence of the Miranda warnings weight here.

9

race-based cases in this country. See, e.g., Brown v. Mississippi, 297 U.S. 278 (1936) (admissions excluded when African-American defendants were whipped until they confessed to murders). But as Judge Kirsch said, "each time courts allow such conduct, they implicitly sanction it and encourage the next police officer in the next interrogation to go a bit further, to be more offensive, more racist and more deceptive." Bond, 2013 WL 2404071 at *6. We agree.

As Dr. King did, we likewise "refuse to accept the view that mankind is so tragically bound to the starless midnight of racism." Dr. Martin Luther King, Jr., Acceptance Speech at Nobel Peace Prize Ceremony (December 10, 1964). We simply cannot and will not risk this going further, and therefore draw a firm line today.

Thus, in considering the totality of the circumstances surrounding Bond's interrogation, despite the otherwise permissible conduct by the detective, and despite Bond's apparent maturity, health, education, and the favorable conditions of the interrogation, this deception by the detective tips the scale to involuntariness. We cannot tacitly countenance the erosion of everything so many have worked so hard to achieve in the realm of racial equality in the justice system—and continue to work to achieve—by disapproving of the statement but finding Bond's confession nevertheless admissible.

**Conclusion**

A police officer may engage in a number of tactics and techniques to induce a confession without rendering that confession involuntary. "Such questioning is undoubtedly an essential tool in effective law enforcement," and "[t]he line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw." Haynes v. Washington, 373 U.S. 503, 515 (1963). But today we hold that intentionally misleading a suspect as to his constitutionally guaranteed rights to a fair trial and an impartial jury, because of his race, sits squarely on the wrong side of that line.

10

The trial court below concluded that, despite its great concern, "there is no caselaw that the Court is aware of that holds that this type of persuasion renders the confession involuntary." We clearly understand the trial court's predicament. But now there is. We reverse the trial court's denial of Bond's motion to suppress and remand this case for further proceedings.

Dickson, C.J., Rucker, Massa, and Rush, JJ., concur.