## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 23 2015, 9:14 am

*Kevin S. Smith*

**CLERK**

of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Darren Bedwell
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Hitzel Palafox-Dominguez, *Appellant-Defendant,* | October 23, 2015 |
| v. | Court of Appeals Case No. 49A02-1412-CR-873 |
| | Appeal from the Marion Superior Court |
| State of Indiana, *Appellee-Plaintiff* | The Honorable Kurt M. Eisgruber, Judge |
| | Cause No. 49G01-1402-FB-5766 |

**Riley, Judge.**

## STATEMENT OF THE CASE

[1] Appellant-Defendant, Hitzel Palafox-Dominguez[1] (Palafox), appeals her conviction for Count I, battery, a Class B felony, Ind. Code § 35-42-2-1(a)(4) (2014); Count II, neglect of a dependant, a Class B felony, I.C. § 35-46-1-4(a)(1) (2014); and Count III, battery, a Class D felony, I.C. § 35-42-2-1(a)(2)(B) (2014).

[2] We affirm.

## ISSUE

[3] Palafox raises one issue on appeal, which we restate as: Whether the trial court abused its discretion by admitting her confession at trial.

## FACTS AND PROCEDURAL HISTORY

[4] On October 15, 2013, A.L. was born prematurely to Palafox and Omar Lavalle (Lavalle). After spending approximately six weeks at the neonatal intensive care unit, A.L. was discharged on November 28, 2013, and sent home to live with her parents. Because Lavalle worked ten-and-a-half hour days, six to seven days per week, Palafox was A.L.'s primary caregiver. On January 30, 2014, after A.L. had been crying excessively for three days, Palafox took her to the emergency room at Eskenazi Hospital. The treating physician noticed that

---

[1] The appellate docket and Appellant's brief reflect Appellant's last name as Palafox-Domingues. However, at trial, Appellant concurred that the final letter of her name should be a "z." The State moved to amend the charging information to reflect Appellant's last name as Palafox-Dominguez.

A.L. had bruising to her face, thighs, buttocks, and back and referred her to Riley Hospital for Children (Riley).

[5] At Riley, A.L. was examined by Shannon Thompson, M.D. (Dr. Thompson), a board certified physician in pediatrics and pediatric child abuse. Upon examining A.L., Dr. Thompson discovered that she "had soft tissue injuries or bruising to her body in different areas. She had three different broken bones or fractures and she had intracranial hemorrhage or bleeding on the brain." (Transcript p. 184). When Dr. Thompson closely examined A.L.'s bruises on her left facial cheek and her thighs, she noticed that they "were consistent with the shape of a bite mark" and "indicative of injuries that had been inflicted." (Tr. pp. 187, 191). Dr. Thompson opined that those bruises could not have been caused accidentally and their infliction would have caused A.L. "extreme pain." (Tr. p. 192). In addition to bruises, A.L. had three fractures: a classic lesion in the upper arm bone and a corner fracture in the lower thigh bone on both the left and right side. Dr Thompson clarified that

> a corner fracture is typically caused by some type of significant force that either is providing – or putting tension or sheer on the end of the – end of a long bone that essentially results in the end of that bone being ripped off or fractured. The most common mechanisms from abusive causes would be violent yanking, pulling, grabbing, twisting or - - and it's also seen when infants are violently shaken if their arms are - - arms or legs are flailing.

(Tr. p. 197). Again, Dr. Thompson added that these fractures would have "caused extreme pain" at the time they were inflicted. (Tr. p. 203). Based on

"the constellation of all of [A.L.'s] injuries," Dr. Thompson declared A.L. to be the victim of "child abuse." (Tr. p. 215).

[6] On February 3, 2014, Palafox and Lavalle were interviewed by Indianapolis Metropolitan Police Detective Justin Hickman (Detective Hickman) at the Child Advocacy Center. When Palafox and Lavalle arrived at their appointment with Detective Hickman, they were escorted to separate interview rooms. Because Palafox speaks little English, an interpreter facilitated translations between Palafox and Detective Hickman.

[7] At the commencement of the interview, Detective Hickman advised Palafox of her *Miranda* rights. She was also given a Spanish-language written advisement form. At the end of the advisement, Palafox asked several clarifying questions about these rights and whether she was detained and should have an attorney present. Detective Hickman responded that she was not detained "at this time" and explained that this advisement was "standard procedure" to "make sure [she] was willing to talk to [him]." (State's Exh. 48, p. 5). Palafox assured him that she could talk to him "because [she] was sure that [she] have done [sic] nothing to [her] daughter." (State's Exh. 48, p. 6).

[8] The first twenty-eight minutes of the interview were consumed by Palafox' monologue, talking about the hospital care she and A.L. had received upon A.L.'s premature birth. Thereafter, Palafox told Detective Hickman that even though A.L. had been crying more than usual on the previous Tuesday, January 28, 2014, she waited to take A.L. to the emergency room until Friday

because of her fussiness when eating and constipation. She advised Detective Hickman that this was the first time she noticed the bruising on A.L.'s body. Detective Hickman showed Palafox photos of the bruises and informed her that the bruises were consistent with bite marks; using a doll, he pointed to A.L.'s fractures. Palafox confirmed that while she is A.L.'s primary care giver, she had never seen anyone bite or harm her daughter. Shortly thereafter, Detective Hickman told Palafox that if he "can't figure out what happened to [A.L.]," it will "be the [D]epartment of [C]hild [S]ervices (DCS) and the police department's recommendation that [A.L.] stays in foster care." (State's Exh. 48, p. 49). After this exchange, Detective Hickman and the interpreter left the room and Palafox requested to use the restroom.

[9]     About two minutes later, Palafox returned to the interview room. After the door closed behind her, she discovered that the door was locked. Approximately ten minutes later, Detective Hickman returned to the room with peanut butter crackers and water. When Detective Hickman entered the room, Palafox asked him whether she was detained and should be getting a lawyer. Detective Hickman assured her that she was "free to go if [she] wish[ed] to go" and that it was "totally up to [her]" to get an attorney. (State's Exh. 48, p. 53). When she raised a concern about the locked door, Detective Hickman explained that the doors lock automatically, and if a person is in one of the rooms alone, it was standard procedure to keep the doors closed because employees' desks containing both personal items and firearms were nearby.

Detective Hickman left again, to "get [Lavalle] situated." (State's Exh. 48, p. 55).

[10] After approximately forty-five minutes, Detective Hickman and the interpreter returned. During the continuation of the interview, Palafox raised several possible explanations for A.L.'s injuries, such as a "cleanse", a cultural massage therapist consulted to make A.L. less "scared," and repeatedly denied her own involvement. (State's Exh. 48, p. 56). After consulting with Dr. Thompson, Detective Hickman rejected the massage as the source of the fractures and bruises. He encouraged Palafox that "if you got upset, if you got frustrated and something happened that you didn't mean to hurt her but something happened then now is the time to talk[,] tell us about that because . . . once you go to court tomorrow . . . DCS is going to make their recommendation for where the baby's placed." (State's Exh. 48, p. 70).

[11] When Palafox continued to deny any involvement with A.L.'s injuries, Detective Hickman advised Palafox that he could "get a warrant and take measurements of [her] mouth and [her] teeth and compare them to the injury on [A.L.]." (State's Exh. 48, p. 80). He informed her that "now is the time to tell the truth because when you leave here you're not going to have another opportunity to talk to me and tell me the truth. . . . But if you leave here today and don't tell me, look I did this, I'm sorry for it, I didn't mean to. . . . and I go and get a warrant and we take our measurement and we match it to that bite . . . you're not going to get your baby back . . . ever." (State's Exh. 48, pp. 81-82). After another denial, Detective Hickman told her that if he has "somebody

sitting across from" him who could not admit that they had injured their child when both of them knew that she had, then "how could [he] or the court trust [Palafox] with [her] baby." (State's Exh. 48, p. 84). He immediately added that he did not want her to admit to something she did not do, but she should take responsibility if she had caused A.L.'s injuries.

[12] Palafox explained that she had post-partum depression and stated that "maybe [she] was the one that did it . . . but [she] [was] not certain that [she] did do that." (State's Exh. 48, p. 86). While assuring that he did not want her to confess to something she did not do, Detective Hickman advised Palafox that she was still not taking responsibility and that "now was the time to be truthful and honest and accept responsibility . . . because once [she] walk[ed] out the door" she would not get another chance. (State's Exh. 48, p. 87). Palafox admitted, "okay, I did it." (State's Exh. 48, p. 87). She recounted an incident which happened the previous Tuesday, when A.L. was crying so forcefully she was almost choking. She placed A.L. in her crib where she calmed down a little. Palafox explained that she got close to A.L.'s legs and she "didn't do it like with being mad with the intention of hurting her but [she] kinda bit her." (State's Exh. 48, p. 88). Palafox clarified that A.L.'s leg might have gotten fractured when she gave the infant a bath, and grabbed one of A.L.'s legs that had gone out of the bathtub.

[13] On February 6, 2014, the State filed an Information, charging Palafox with Count I, battery, a Class B felony; Count II, neglect of a dependent, a Class B felony; and Count III, battery, a Class D felony. On June 19, 2014, Palafox

filed a motion to suppress her confession, asserting it was unconstitutionally coerced from her in violation of her rights under both the federal and state constitutions. After a hearing, the trial court denied the motion, holding that "[n]either the timing nor the manner in which the interviews were conducted were improper and [Palafox's] substantive rights were not violated by virtue of the investigating detective's actions." (Appellant's App. p. 91).

[14] On October 20 through 22, 2014, the trial court conducted a jury trial. Palafox renewed her motion to exclude her confession, arguing its coercive nature and the violation of her constitutional rights. The trial court repeated its denial. At the close of the evidence, the jury found Palafox guilty of all charges. On January 5, 2015, the trial court sentenced Palafox to fifteen years executed on Count I, with seven years suspended and two years of probation. The trial court reduced Count II to a Class D felony due to double jeopardy concerns and imposed a sentence of 545 days. The court also sentenced Palafox to 545 days on Count III. The trial court declared all sentences to run concurrent, for an aggregate sentence of fifteen years.

[15] Palafox now appeals. Additional facts will be provided as necessary

## DISCUSSION AND DECISION

[16] Palafox contends that the trial court abused its discretion by admitting her involuntary and coerced confession in violation of her federal due process rights under the Fourteenth Amendment. When a defendant challenges the voluntariness of his or her confession under the U.S. Constitution, the State

must prove the statement was voluntarily given by a preponderance of the evidence. *Bond v. State*, 9 N.E.3d 134, 137 (Ind. 2014).[2] We examine the totality of the circumstances as presented by the record, and are guided by several factors including police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, and mental health. *Miller v. State*, 770 N.E.2d 763, 767-68 (Ind. 2002). "The critical inquiry is whether the defendant's statements were induced by violence, threats, promises or other improper influence." *Ringo v. State*, 736 N.E.2d 1209-1212-13 (Ind. 2000).

[17] The Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will." *Bond*, 9 N.E.3d at 137 (citing *Jackson v. Denno*, 378 U.S. 369, 385-86, 84 S. Ct. 1174, 12 L.Ed.2d 908 (1964)). Additionally, there is a "deep-rooted feeling that the police must obey the law while enforcing the law; that in the end, life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual

---

[2] Palafox does not articulate a distinct argument under the Indiana Constitution, which would have required the State to meet the higher hurdle of proving voluntariness beyond a reasonable doubt. *See Pruitt v. State*, 834 N.E.2d 90, 114-15 (Ind. 2005).

criminals themselves." *Id*. (quoting *Spano v. New York*, 360 U.S. 315, 320-21, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1959)).

[18] Turning to her confession, Palafox asserts that it was rendered involuntary and uttered against her free will because Detective Hickman made "the threat that she would lose custody of her baby." (Appellant's Br. p. 19). Specifically, Palafox points to the Detective's statements that if he could not figure out what had happened to A.L., it would be DCS's recommendation that A.L. remain in foster care. However, Detective Hickman's statement cannot be categorized as a threat; rather it amounts to a statement as to DCS's standard procedure in investigations of child abuse and imposed upon Palafox the seriousness of the interview and its likely consequences.

[19] Likewise, we reach a similar result with respect to Detective Hickman's statement that

> now is the time to tell the truth because when you leave here you're not going to have another opportunity to talk to me and tell me the truth. . . . But if you leave here today and don't tell me, look I did this, I'm sorry for it, I didn't mean to. . . . and I go and get a warrant and we take our measurement and we match it to that bite . . . you're not going to get your baby back . . . ever.

(State's Exh. 48, pp. 81-82). "A detective's statements implying that a confession would aid" Palafox's case do not in and of themselves render that confession involuntary. *Bond*, 9 N.E.3d at 137. This is "neither a coercive police tactic nor an unexpected one, and we do not view it as having overcome" Palafox's free will. *Id*. Even though Detective Hickman stated that if A.L.'s bite marks matched Palafox's teeth, she would never get A.L. back might be

considered borderline coercive, "[s]tatements by police . . . explaining the crimes and penalties that are possible results are not specific enough to constitute either promises or threats." *See Massey v. State*, 473 N.E.2d 146, 148 (Ind. 1985).

[20] With respect to Detective Hickman's actions of locking Palafox in the room and responding to her questions of being detained and needing legal representation, we find no error. Detective Hickman explained the reasoning behind the locked door to Palafox and even left the door open at her request so she could use the restroom. Besides reading her *Miranda* rights and handing her a Spanish-language written advisement form, Detective Hickman repeatedly assured her that she was free to go if she wished to do so and that it was her decision to retain an attorney.

[21] Palafox also challenges as unduly coercive Detective Hickman's repeated requests to take responsibility and be truthful because once she left she would not get another opportunity to speak with him. On several occasions, we have rejected similar arguments as it is permissive for police officers to express "a desire that a suspect cooperates[.]" *See, e.g.*, *Kahlenbeck v. State*, 719 N.E.2d 1213, 1217 (Ind. 1999). Furthermore, even though the request for cooperation and the truth was reinforced several times, Detective Hickman always reassured Palafox that he did not want her to confess to something she had not done.

[22] In sum, Palafox was invited to an interview at the Child Advocacy Center, a less coercive setting than a police department's interrogation room. She was

provided with an interpreter and voluntarily signed a waiver of rights. Detective Hickman responded appropriately to all her legal questions. She was provided with restroom breaks, food, and water. Detective Hickman gave Palafox time to present her version of the injuries and offer alternative scenarios, which he countered by impressing upon her the seriousness of A.L.'s harm. Detective Hickman did not threaten Palafox, nor did he coerce her into a confession. Rather, he presented her with the gravity of the situation and its likely consequences. After the interview, Palafox was escorted to the lobby and free to go. Based on the totality of the circumstances, we cannot conclude that Palafox' confession was involuntarily rendered in violation of the Fourteenth Amendment.

## CONCLUSION

[23] Based on the foregoing, we conclude the trial court properly admitted Palafox' confession at trial.

[24] Affirmed.

[25] Brown, J. and Altice, J. concur